JEFFREY SPANEL, A MINOR, BY CHARLES SPANEL, HIS
FATHER AND NATURAL GUARDIAN, AND ANOTHER
v. MOUNDS VIEW SCHOOL DISTRICT NO. 621
AND OTHERS.

118 N. W. (2d) 795.

December 14, 1962—No. 38,513.

*Bertie & Bettenburg* and *John Claeson,* for appellants.

*Meagher, Geer, Markham & Anderson, O. C. Adamson II,* and
*M. J. Coyne,* for respondent.

*William H. DeParcq, Charles T. Hvass, Eugene A. Rerat, Donald
L. Rudquist, Israel Steingold,* and *Charles Alan Wright,* for National
Association of Claimants' Counsel of America, amicus curiae.

280

*Walter F. Mondale,* Attorney General, and *Linus J. Hammond,* Assistant Attorney General, amici curiae.

*Orville C. Peterson* and *David J. Kennedy,* for League of Minnesota Municipalities, amicus curiae.

*Peter S. Popovich, Edward P. Starr,* and *Peterson & Popovich,* for Minnesota School Boards Association, Metropolitan-Suburban School Boards Association, and certain school districts, amici curiae.

*Ralph T. Keyes,* for State Association of County Commissioners, amicus curiae.

*Robert J. Swords,* Corporation Counsel of St. Paul, amicus curiae.

*Keith M. Stidd,* City Attorney of Minneapolis, and *G. V. Johnson,* Assistant City Attorney, amici curiae.

*Montreville J. Brown, Gordon Shepard,* and *Oppenheimer, Hodgson, Brown, Baer & Wolff,* for Metropolitan Airports Commission, amicus curiae.

*Harry E. Weinberg,* City Attorney of Duluth, and *D. Peter Rask,* Assistant City Attorney, amici curiae.

*William B. Randall,* County Attorney of Ramsey County, and *Thomas Quayle,* Assistant County Attorney, amici curiae.

OTIS, JUSTICE.

Plaintiff sues on behalf of his 5-year-old son to recover damages from a school district and a teacher and principal employed by it for injuries resulting from the alleged negligence of defendants in permitting a defective slide to remain in the kindergarten classroom of an elementary school.

Plaintiff appeals from an order granting a motion to dismiss the action as to defendant school district on the ground the complaint fails to state a claim upon which relief can be granted against it.

The only issue before us is whether the doctrine of governmental tort immunity shall now be overruled by judicial decision.

Anticipating the grave problems which a reversal might precipitate, the court has sua sponte requested and secured a reargument after notice to the State Board of Education, the attorney general, the League of Minnesota Municipalities, and a number of municipalities and bar associations. Briefs amicus curiae on both sides of the

issue have been submitted by interested organizations and units of government.

We hold that the order for dismissal is affirmed, with the caveat, however, that subject to the limitations we now discuss, the defense of sovereign immunity will no longer be available to school districts, municipal corporations, and other subdivisions of government on whom immunity has been conferred by judicial decision with respect to torts which are committed after the adjournment of the next regular session of the Minnesota Legislature.

All of the paths leading to the origin of governmental tort immunity converge on Russell v. The Men of Devon, 100 Eng. Rep. 359, 2 T. R. 667 (1788). This product of the English common law was left on our doorstep to become the putative ancestor of a long line of American cases beginning with Mower v. Leicester, 9 Mass. 247 (1812). Russell sued all of the male inhabitants of the County of Devon for damages occurring to his wagon by reason of a bridge being out of repair. It was apparently undisputed that the county had a duty to maintain such structures. The court held that the action would not lie because: (1) To permit it would lead to "an infinity of actions,"[1] (2) there was no precedent for attempting such a suit, (3) only the legislature should impose liability of this kind, (4) even if defendants are to be considered a corporation or quasi-corporation there is no fund out of which to satisfy the claim, (5) neither law nor reason supports the action, (6) there is a strong presumption that what has never been done cannot be done, and (7) although there is a legal principle which permits a remedy for every injury resulting from the neglect of another, a more applicable principle is "that it is better that an individual should sustain an injury than that the public should suffer an inconvenience."[2] The court concluded that the suit should not be permitted "*because the action must be brought against the public.*" (Italics supplied.)[3] There is no mention of "the king can do no wrong," but on the contrary it is suggested that plaintiff sue

---

[1] 100 Eng. Rep. 362, 2 T. R. 671.
[2] 100 Eng. Rep. 362, 2 T. R. 673.
[3] 100 Eng. Rep. 363, 2 T. R. 673.

the county itself rather than its individual inhabitants. Every reason assigned by the court is born of expediency. The wrong to plaintiff is submerged in the convenience of the public. No moral, ethical, or rational reason for the decision is advanced by the court except the practical problem of assessing damages against individual defendants. The court's invitation to the legislature has a familiar ring. It was finally accepted as to claims against the Crown in 1947, although Russell had long since been overruled.[4]

In 1812 when Mower's horse was killed by stepping in a hole on the Leicester bridge, counsel argued that "Men of Devon" did not apply since the town of Leicester was incorporated and had a treasury out of which to satisfy a judgment. The Massachusetts court nevertheless held that the town had no notice of the defect and that quasi-corporations are not liable for such neglect under the common law. On the authority of "Men of Devon" recovery was denied.[5] It was on this shaky foundation that the law of governmental tort immunity was erected in Minnesota and elsewhere. In 1871 we held that one who was injured by a defective bridge *did* have a cause of action against a municipal corporation for its negligence, citing "Men of Devon."[6] A few years later we recognized the distinction between municipal corporations and quasi-corporations with respect to liability to individuals for the negligence of municipal officers or agents. Without citing any authority we held that a plaintiff injured on a defective courthouse sidewalk could not recover damages against the county, basing our decision on what we said was a long-established doctrine which "the legislature alone should change."[7]

---

[4]Molitor v. Kaneland Community Unit Dist. 18 Ill. (2d) 11, 15, 163 N. E. (2d) 89, 91. Tort claims against the Crown were expressly authorized by Crown Proceedings Act, 1947, 10 & 11 Geo. 6, c. 44.

[5]The editor's note appended to the Mower decision in 1864 observes that on the reasoning of "Men of Devon" the court should have allowed the Mower action to be maintained. See, Barnett, *The Foundations of the Distinction Between Public and Private Functions in Respect to the Common-Law Tort Liability of Municipal Corporations*, 16 Ore. L. Rev. 250, 264; Borchard, *Government Liability in Tort*, 34 Yale L. J. 1, 41.

[6]Shartle v. City of Minneapolis, 17 Minn. 284 at 289 (308 at 313).

[7]Dosdall v. County of Olmsted, 30 Minn. 96, 98, 14 N. W. 458.

The following year we reverted to "Men of Devon" in finding a town not liable for its negligent failure to repair a bridge,[8] defendant citing also Mower v. Leicester, *supra.*

An 8-year-old boy was denied recovery for the loss of a leg injured on defendant's school grounds in Bank v. Brainerd School Dist. 49 Minn. 106, 109, 51 N. W. 814, 815. We held that the school district enjoyed the same tort immunity as towns and counties, saying:

"* * * So the board of education is a corporation, which holds and manages the property in its control as trustee for the district, for a public purpose. It is made its duty to take care of and keep in repair the property of the district, but this is a duty which it owes to the district, and not to individuals, and is a duty imposed for the benefit of the public, with no consideration or emolument to the corporation; and it is given a corporate existence solely for the exercise of this public or administrative function. It is organized for educational purposes, not for the benefit or protection of property or business interests. Finch v. Board of Education, 30 Ohio St. 47.

"The rule as adopted and applied in those states which accept this doctrine, is summarily stated in Shear. & R. Neg. § 267, as follows: Boards of education, on which is imposed by the state the duty of providing and keeping in repair public school buildings, exercise a purely public function and agency for the public good, for which they receive no private or corporate benefit; and they are not, therefore, liable to an individual for the negligence of their servants in the business of such agency."

The court then said it doubted that the statute[9] (from which Minn.

---

[8]Altnow v. Town of Sibley, 30 Minn. 186, 190, 14 N. W. 877.

[9]"An action may be brought against [trustees of a school district] in their official capacity, either upon a contract made by such officers in their official capacity, and within the scope of their authority, or for an injury to the rights of the plaintiff, arising from some act or omission of such officers or of the district. The actions authorized by this chapter may be brought by or against said trustees, upon a cause of action which accrued within the term of their predecessors, as well as within their own term of office, and, when brought, may be continued by or against the

St. 127.03 has evolved) was intended to render a school district liable for personal injuries for mere neglect to repair but that the statute apparently referred to a breach of duty to an individual, not a public duty such as there involved. In a later case where plaintiff was injured by a school bus we said that a school district is an arm of the state, its functions are governmental, and the legislature having acquiesced for 35 years in the court's previous interpretation of the statute, that construction must have been correct.[10]

The distinction between governmental functions, which are immune from tort liability, and proprietary functions, which are not, emerged in an opinion of Mr. Justice Mitchell in Snider v. City of St. Paul, 51 Minn. 466, 53 N. W. 763, 18 L. R. A. 151. Plaintiff's foot had been crushed by a city hall elevator. In holding the municipality not liable, Judge Mitchell stated (51 Minn. 472, 53 N. W. 764):

"But it is also generally held that they are not liable for negligence in the performance of a public, governmental duty imposed upon them for public benefit, and from which the municipality in its corporate or proprietary capacity derives no pecuniary profit. The liabilities of cities for negligence in not keeping streets in repair would seem to be an exception to this general rule, which we think the courts would do better to rest either upon certain special considerations of public policy or upon the doctrine of *stare decisis* than to attempt to find some strictly legal principle to justify the distinction."

This rule was followed in denying recovery against a school district for blindness caused a student by the use of unslaked lime in marking a football field.[11] Our impatience with perpetuating these injustices was manifested in Nissen v. Redelack, 246 Minn. 83, 90, 74 N. W. (2d) 300, 304, 55 A. L. R. (2d) 1428, where we barred a claim against the city for negligently permitting a child to drown in a city swimming pool. We said:

successors in office of the parties, whose names may, for that purpose, be submitted in the action." G. S. 1878, c. 36, § 117.

[10]Allen v. Independent School Dist. No. 17, 173 Minn. 5, 216 N. W. 533.

[11]Mokovich v. Independent School Dist. No. 22, 177 Minn. 446, 225 N. W. 292.

"* * * The matter of public recreation and use of recreational facilities is reaching such large proportions in this day and age that the time may well be here when greater consideration and attention must be given to the entire question of governmental immunity in connection with the operation and supervision of such places. However, it is not the function of the courts to pass laws in this respect, and any change in this policy must come from the legislature."

In holding a city liable under the Civil Damage Act, Minn. St. 340.95,[12] we noted:

"* * * Some states have already abolished the distinction between governmental and proprietary functions in keeping with the modern tendency which is to restrict rather than extend the doctrine of municipal immunity. The injustice of the immunity doctrine to injured individuals in this era of rapidly expanding governmental functions and services is apparent."[13]

Thus the handwriting has long been on the courtroom wall. We have been troubled for three generations by the unheeded petitions of the lame Frederick Bank, the halt Jennie Snider, and the blind Frank Mokovich. Since we have repeatedly proclaimed that this defense is based on neither justice nor reason, the time is now at hand when corrective measures should be taken by either legislative or judicial fiat.

Some of the arguments advanced for retaining sovereign tort immunity are these: Stare decisis and stability in the law require it. There are no funds available to satisfy claims. The discretionary activities of administrative officials would be seriously circumscribed by the specter of tort liability for mistakes in judgment. The functions of government are mandatory under our system, involving many dangerous and hazardous undertakings, exposing vast numbers of persons to potential harm. It is a practical impossibility to police all of the activities of school children. Many units of government do not have sufficient resources to absorb a substantial loss without the threat of bankruptcy.

---

[12]Sometimes called the "Dram Shop Act."

[13]Hahn v. City of Ortonville, 238 Minn. 428, 434, 57 N. W. (2d) 254, 259.

Very recently a number of American jurisdictions have met sovereign immunity head on. In 1957 Colorado permitted an action against the State Racing Commission for "breakage"[14] in a decision which coined the much-quoted phrase, "In Colorado 'sovereign immunity' may be a proper subject for discussion by students of mythology but finds no haven or refuge in this Court."[15] Three years later to the dismay of three dissenters the court backtracked by invoking immunity with respect to the governmental functions of a county.[16] The Florida Supreme Court abolished tort immunity as to the governmental functions of municipalities on the ground that the Revolutionary War abrogated the doctrine that "the king can do no wrong."[17] The Florida action for the wrongful death of a prisoner was based on the negligence of a jailer. The court stated that the rule cannot be supported if there is to be a remedy for every wrong and refused to wait longer for legislative action. However, the opinion admonished against construing the decision as imposing liability on municipalities in exercising their judicial, quasi-judicial, legislative, or quasi-legislative functions.

Thereafter the same state beat a judicial retreat by holding that it had not overruled tort immunity as to the state, its counties, or its county school boards. It denied recovery to a spectator injured at a high school baseball game. The court based its decision both on constitutional grounds and on the theory of sovereignty, concluding:

"Regardless of our personal views, we feel that a proper administration of justice invites respect for the admonition of Alexander Hamilton, who once wrote that courts 'must declare the sense of the law; and if they should be disposed to exercise *Will* instead of *Judgment*, the consequences would equally be the substitution of their pleasure to that of the legislative body.' If, therefore, a change in the long es-

---

[14]Odd cents not paid to winning pari-mutuel bettors. Webster's Third New International Dictionary (1961) p. 272.

[15]Colorado Racing Comm. v. Brush Racing Assn. 136 Colo. 279, 284, 316 P. (2d) 582, 585.

[16]Liber v. Flor, 143 Colo. 205, 353 P. (2d) 590.

[17]Hargrove v. Town of Cocoa Beach (Fla.) 96 So. (2d) 130, 132, 60 A. L. R. (2d) 1193, 1195; Annotation, 60 A. L. R. (2d) 1198.

tablished rule of immunity prevailing in this State is to be made, it must come as it did in the States of New York, Washington and California either by constitutional amendment, or by enactment of appropriate legislation, or both."[18]

California undertook to abolish tort immunity in a suit against a public hospital district.[19] Mr. Justice Traynor in a carefully documented and thoroughly considered opinion adverted to Borchard's comment in his classic treatise on the subject:

"Nothing seems more clear than that this immunity of the King from the jurisdiction of the King's courts was purely personal. How it came to be applied in the United States of America, where the prerogative is unknown, is one of the mysteries of legal evolution."[20]

The court traced the doctrine of immunity through "Men of Devon" and "Inhabitants of Leicester" and concluded that it is "an anachronism without rational basis and has existed only by force of inertia."[21] Over the objection that it was the legislature's duty to administer the last rights, the California court held that it was a court-made rule initially and its "requiem has long been foreshadowed."[22] The California legislature promptly declared a moratorium on this and other claims similarly situated.[23]

A Washington decision[24] overruling tort immunity of a charitable institution stated, "We closed our courtroom doors without legislative help, and we can likewise open them." New Jersey in discarding the last vestiges of municipal tort immunity also brushed aside the question of stare decisis and the objection that this was exclusively a legis-

---

[18]Buck v. McLean (Fla. App.) 115 So. (2d) 764, 768.

[19]Muskopf v. Corning Hospital Dist. 55 Cal. (2d) 211, 359 P. (2d) 457, 49 Calif. L. Rev. 400.

[20]Borchard, *Government Liability in Tort*, 34 Yale L. J. 1, 4.

[21]55 Cal. (2d) 216, 359 P. (2d) 460.

[22]55 Cal. (2d) 221, 359 P. (2d) 463.

[23]Corning Hospital Dist. v. Superior Court, 20 Cal. Rptr. 621, 370 P. (2d) 325.

[24]Pierce v. Yakima Valley Memorial Hospital Assn. 43 Wash. (2d) 162, 178, 260 P. (2d) 765, 774.

lative prerogative. McAndrew v. Mularchuk, 33 N. J. 172, 193, 162 A. (2d) 820, 832.

Three neighboring states have come to grips with the question. A leading case is Molitor v. Kaneland Community Dist. 18 Ill. (2d) 11, 163 N. E. (2d) 89. The plaintiff was a student riding a school bus when he was injured by the alleged negligence of the driver. The suit was against the school district under the doctrine of respondeat superior. The Illinois court traced its immunity law to "Men of Devon." The classic observation first made in Annotation, 75 A. L. R. 1196, and approved by the New Mexico court[25] was repeated:

"* * * The whole doctrine of governmental immunity from liability for tort rests upon a rotten foundation. It is almost incredible that in this modern age of comparative sociological enlightenment, and in a republic, the medieval absolutism supposed to be implicit in the maxim, 'the King can do no wrong,' should exempt the various branches of the government from liability for their torts, and that the entire burden of damage resulting from the wrongful acts of the government should be imposed upon the single individual who suffers the injury, rather than distributed among the entire community constituting the government, where it could be borne without hardship upon any individual, and where it justly belongs."[26]

The court rejected the "protection-of-public-funds" theory on the ground that public education is the biggest business in the country, quoting Dean Green:[27]

"* * * Private concerns have rarely been greatly embarrassed, and in no instance, even where immunity is not recognized, has a municipality been seriously handicapped by tort liability. This argument is like so many of the horribles paraded in the early tort cases when courts were fashioning the boundaries of tort law. It has been thrown in simply because there was nothing better at hand. The public's willingness to stand up and pay the cost of its enterprises carried out through

---

[25]Barker v. City of Santa Fe, 47 N. M. 85, 88, 136 P. (2d) 480, 482.
[26]18 Ill. (2d) 21, 163 N. E. (2d) 94.
[27]Green, *Freedom of Litigation,* 38 Ill. L. Rev. 355, 379.

municipal corporations is no less than its insistence that individuals and groups pay the cost of their enterprises. Tort liability is in fact a very small item in the budget of any well organized enterprise."[28]

Because of the hardship which would otherwise occur to school districts which had relied on the previous rules of immunity, the court revoked the doctrine prospectively only, except as to the plaintiff in that case, later relenting to the extent of entertaining the claims of the other injured passengers on the same bus.[29] The Illinois Legislature responded promptly by reinstating tort immunity with respect to a number of subdivisions of government.[30]

Michigan had much the same experience as Colorado in assuming it had swept away all sovereign immunity, only to discover it had not. A sharply divided court held the city of Detroit not liable for the wrongful death of a furniture mover who fell down an unguarded elevator shaft in a municipal building, but prospectively overruled governmental immunity from tort liability.[31] The court justified its failure to adhere to stare decisis in the language of Mr. Justice Holmes (Collected Legal Papers, p. 187):

"* * * It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past,"[32]

and quoted Mr. Justice Cardozo (The Nature of the Judicial Process, p. 152):

"* * * If judges have woefully misinterpreted the *mores* of their day, or if the *mores* of their day are no longer those of ours, they ought not to tie, in helpless submission, the hands of their successors."[33]

---

[28]18 Il. (2d) 24, 163 N. E. (2d) 95.

[29]Molitor v. Kaneland Community Unit Dist. 24 Ill. (2d) 467, 182 N. E. (2d) 145.

[30]9 De Paul L. Rev. 39.

[31]Williams v. City of Detroit, 364 Mich. 231, 111 N. W. (2d) 1.

[32]364 Mich. 257, 111 N. W. (2d) 24.

[33]364 Mich. 264, 111 N. W. (2d) 27.

Subsequent opinions made it clear that the decision affected municipal corporations only,[34] the tort liability of other subdivisions of government being controlled by statutory exemptions.[35]

Finally, the Wisconsin court in June 1962 held the city of Milwaukee liable for injuries sustained by a child arising out of the alleged negligence of city employees in leaving a trapdoor open on a city playground.[36] Again sovereign immunity was traced to "Men of Devon" and "Inhabitants of Leicester." The court concluded:

"There are probably few tenets of American jurisprudence which have been so unanimously berated as the governmental immunity doctrine. This court and the highest courts of numerous other states have been unusually articulate in castigating the existing rule; text writers and law reviews have joined the chorus of denunciators."

After reviewing the authorities, the Wisconsin court held:

"* * * The doctrine of governmental immunity having been engrafted upon the law of this state by judicial provision, we deem that it may be changed or abrogated by judicial provision."

Except as to the case at hand, the decision was given prospective application only.

Even in jurisdictions which adhere to the immunity doctrine, seldom is any justification advanced beyond the rule of stare decisis.[37]

Our consideration of the origins of tort immunity persuade us that its genesis was accidental and was characterized by expediency, and that its continuation has stemmed from inertia. The development of

---

[34]McDowell v. State Highway Commr. 365 Mich. 268, 112 N. W. (2d) 491.

[35]Sayers v. School Dist. No. 1, 366 Mich. 217, 114 N. W. (2d) 191; Stevens v. City of St. Clair Shores, 366 Mich. 341, 115 N. W. (2d) 69.

[36]Holytz v. City of Milwaukee, 17 Wis. (2d) 26, 115 N. W. (2d) 618, 621, 624.

[37]Supler v. North Franklin Township School Dist. 407 Pa. 657, 182 A. (2d) 535; Stouffer v. Morrison, 400 Pa. 497, 162 A. (2d) 378; Nelson v. Maine Turnpike Authority, 157 Me. 174, 170 A. (2d) 687; see, also, Michael v. Hahnemann Medical College & Hospital, 404 Pa. 424, 172 A. (2d) 769, and State v. Shinkle, 231 Ore. 528, 373 P. (2d) 674.

governmental liability for proprietary functions was an acknowledgment that the original rule was unduly restrictive, and reflected an uneasiness in the corporate conscience. No student of the law has suggested any explanation for the arbitrary assumption of legal responsibility for negligence in the maintenance of municipal streets and sidewalks and contemporaneously a rigid adherence to immunity with respect to those maintained by towns and counties. It has been argued on behalf of defendants that if immunity is abolished public schools will be deluged with claims for injuries resulting from inadequate supervision, from frostbite while waiting for buses, from blows struck by other children, from forbidden and mischievous activities impulsively and foolishly inspired, and from a host of other causes. School children have a special status in the eyes of the law, and in view of the compulsory attendance statute[38] deserve more than ordinary protection. Operating an educational system has been described as one of the nation's biggest businesses. The fact that subdivisions of government now enjoy no immunity in a number of areas of activity has not noticeably circumscribed their usefulness or rendered them insolvent.

Nor have our privately endowed schools and colleges been forced to close their doors or curtail their academic and extracurricular programs because the law has imposed on them liability for the negligence of their employees in dealing with students and the public. Whatever may have been the economy in the time of "Men of Devon," it is absurd to say that school districts cannot today expeditiously plan for and dispose of tort claims based on the doctrine of respondeat superior.

The Minnesota Legislature has not wholly ignored the problem.[39]

---

[38]Minn. St. 120.10.

[39]§ 360.033, subd. 2, provides:

"No action or suit sounding in tort shall be brought or maintained against the state, any municipality, or the officers, agents, servants, or employees thereof, on account of any act done in or about the construction, enlargement, improvement, maintenance, operation, regulation, superintendence, or management of any airport or other air navigation facility."

School districts have been authorized to provide liability insurance and to waive immunity with respect to claims so insured.[40] Such laws are important steps toward mitigating the harshness of the immunity doctrine. However, we do not share the view that a court-made rule, however unjust or outmoded, becomes with age invulnerable to judicial attack and cannot be discarded except by legislative action.

While the court has the right and the duty to modify rules of the common law after they have become archaic, we readily concede that the flexibility of the legislative process—which is denied the judiciary —makes the latter avenue of approach more desirable.

We recognize that by denying recovery in the case at bar the remainder of the decision becomes dictum. However, the court is unanimous in expressing its intention to overrule the doctrine of sovereign tort immunity as a defense with respect to tort claims against school districts, municipal corporations, and other subdivisions of government on whom immunity has been conferred by judicial decision arising after the next Minnesota Legislature adjourns, subject to any statutes which now or hereafter limit or regulate the prosecution of such claims. However, we do not suggest that discretionary as distinguished from ministerial activities, or judicial, quasi-judicial, legislative, or quasi-legislative functions may not continue to have the benefit of the

§ 412.221, subd. 4, waives immunity as to villages to the extent of liability insurance coverage.

§ 465.62 contains a similar provision with respect to cities and school districts. See, also, §§ 465.09 to 465.121.

[40]§ 123.41 reads:

"The governing body of any independent school district may procure insurance against liability of the school district or of its officers and employees for damages resulting from wrongful acts and omissions of the school district and its officers and employees, whether the acts or omissions relate to governmental or proprietary functions of the school district. Insofar as this insurance relates to governmental functions of the school district, the policy of insurance shall contain a provision under which the insurance company agrees to waive the defense of governmental immunity up to the limits of the policy unless the school district consents to the assertion of that defense."

rule.[41] Nor is it our purpose to abolish sovereign immunity as to the state itself.[42]

Counsel has assured us that members of the bar, in and out of the legislature, intend to draft and secure the introduction of bills at the forthcoming session which will give affected entities of government an opportunity to meet their new obligations. A number of procedural and substantive proposals for the orderly processing of claims have been suggested. Among them are: (1) A requirement for giving prompt notice of the claim after the occurrence of the tort, (2) a reduction in the usual period of limitations, (3) a monetary limit on the amount of liability, (4) the establishment of a special claims court or commission, or provision for trial by the court without a jury, and (5) the continuation of the defense of immunity as to some or all units of government for a limited or indefinite period of time.

The technique of prospective overruling has the sanction not only of legal scholars and commentators but of the United States Supreme Court as well. In G. N. Ry. Co. v. Sunburst Oil & Refining Co. 287 U. S. 358, 365, 53 S. Ct. 145, 149, 77 L. ed. 360, 367, the Supreme Court held that this device met no constitutional impediments:

[41]Lipman v. Brisbane Elementary School Dist. 55 Cal. (2d) 224, 233, 359 P. (2d) 465, 469; 46 Minn. L. Rev. 1143; 40 Minn. L. Rev. 789; Hargrove v. Town of Cocoa Beach (Fla.) 96 So. (2d) 130, 133, 60 A. L. R. (2d) 1193, 1197; Annotation, 60 A. L. R. (2d) 1198.

[42]"Since the adoption of the eleventh amendment to the constitution it has been uniformly held that a suit by an individual cannot be maintained against a sovereign state without its consent." Berman v. Minnesota State Agricultural Society, 93 Minn. 125, 127, 100 N. W. 732.

U. S. Const. Amend. XI provides:

"The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by citizens or subjects of any foreign state."

See, also, State, by Benson, v. Stanley, 188 Minn. 390, 393, 247 N. W. 509, 510; Dunn v. Schmid, 239 Minn. 559, 562, 60 N. W. (2d) 14, 16; Hans v. Louisiana, 134 U. S. 1, 10 S. Ct. 504, 33 L. ed. 842; Palmer v. Ohio, 248 U. S. 32, 39 S. Ct. 16, 63 L. ed. 108; Monaco v. Mississippi, 292 U. S. 313, 54 S. Ct. 745, 78 L. ed. 1282; 31 Minn. L. Rev. 475; Note, 40 Minn. L. Rev. 234.

"* * * we may say of the earlier decision that it has not been overruled at all. It has been translated into a judgment of affirmance and recognized as law anew. Accompanying the recognition is a prophecy, which may or may not be realized in conduct, that transactions arising in the future will be governed by a different rule."

One commentator has observed (60 Harv. L. Rev. 440):

"A more practical objection, perhaps, is that, if the courts are to apply their decisions prospectively, there will be no incentive to appeal the upholding of precedent or statute since the appellant cannot in any event benefit from a reversal invalidating them. Sufficient incentive would remain, however, to those litigants who conduct a business in which the question to be decided is likely to arise again in the future. And a chance for a favorable decision on appeal would exist wherever there was a possibility of convincing the appellate court that the facts in the particular case did not merit prospective application of the decision."

On this subject Mr. Justice Cardozo has stated (109 Pa. L. Rev. 13):

"The rule that we are asked to apply is out of tune with the life about us. It has been made discordant by the forces that generate a living law. We apply it to this case because the repeal might work hardship to those who have trusted to its existence. We give notice, however, that any one trusting to it hereafter will do so at his peril."

See, also, Keeton, *Creative Continuity in the Law of Torts,* 75 Harv. L. Rev. 463, 486.

It may appear unfair to deprive the present claimant of his day in court. However, we are of the opinion it would work an even greater injustice to deny defendant and other units of government a defense on which they have had a right to rely. We believe that it is more equitable if they are permitted to plan in advance by securing liability insurance or by creating funds necessary for self-insurance. In addition, provision must be made for routinely and promptly investigating personal injury and other tort claims at the time of their

occurrence in order that defendants may marshal and preserve whatever evidence is available for the proper conduct of their defense.
Affirmed.