V. L. COOPER, Appellant,

v.

RUTHERFORD COUNTY, Appellee.

Supreme Court of Tennessee.

Dec. 15, 1975.

Dicken E. Kidwell, Murfreesboro, for appellant.

William T. Sellers, Smith & Sellers, Murfreesboro, for appellee.

## OPINION

FONES, Chief Justice.

In this direct appeal the appellant, V. L. Cooper, filed a suit for damages against the appellee, Rutherford County, as a result of the drowning death of his wife. The trial court dismissed the action under T.R.C.P. Rule 12.02(6) on the ground that the doctrine of sovereign immunity precluded recovery against the defendant county. We affirm the action of the trial court.

The following facts are alleged in the complaint: On December 24, 1974, at approximately 11:15 p. m., appellant's wife had left work at the Rutherford County Nursing Home and was proceeding on the County Farm Road, a two lane black top road, toward her home when she "suddenly and unexpectedly" ran into the flood water of the Stones River, where the road crosses over the river. Her car was then carried downstream and she drowned. Mrs. Cooper's automobile was in front of another automobile driven by a Mrs. Pitts who also drove into the water. Mrs. Pitts escaped from her automobile, but it was carried away by the water. The complaint also alleges that the night was dark and rainy, and there were no lights, markers, or signs in the vicinity where the road crosses the river.

Appellant argues that this action may be maintained on three (3) separate theories: (1) the County is liable in negligence because the doctrine of sovereign immunity should be abrogated; (2) the county may not escape liability by relying on sovereign

immunity as it maintained a public nuisance by building and operating a dangerous road and bridge; (3) the dangerous road and bridge resulted in a trap created by the defendant county which precludes defendant's reliance upon the doctrine of sovereign immunity.

## I.

In support of his proposition that the doctrine of sovereign immunity should be judicially abrogated, appellant cites many cases in jurisdictions where this has been accomplished.

In 1973 the General Assembly of Tennessee enacted the Governmental Tort Liability Act, T.C.A. § 23–3301 et seq. T.C.A. § 23–3309 expressly removes immunity from suit for injury caused by the dangerous condition of any street, alley, sidewalk or highway, where construction or actual notice of such condition is alleged and proven. As originally enacted a local political body had the option to "exempt itself under certain conditions." We assume Rutherford County to be exempt pursuant to T.C.A. § 23–3303 by the failure of appellant to raise the issue in response to the county's plea of governmental immunity. In *Johnson v. Oman Construction Company*, 519 S.W.2d 782 (Tenn.1975) we considered this statute and stated:

"We do not regard this statute as dealing with the subject in a complete or comprehensive manner. We are reluctant to take judicial action in this area, however, without giving the General Assembly an opportunity to establish a comprehensive and uniform tort claims procedure governing suits against cities, counties and other political subdivisions or their agencies in the duly constituted courts of the state." 519 S.W.2d 786.

Subsequent to the *Johnson* decision, the General Assembly enacted Chapter 252 of the Public Acts of 1975 which removed the option of the local government to exempt itself from the Government Tort Liability Act. Chapter 252 provides that the govern-

mental units that have exempted themselves from the Act would automatically be subject to the provisions of that Act for all claims or actions arising after January 1, 1976. After that date, this category of tort claims will be stripped of the shield of governmental immunity in all of the counties and municipalities of Tennessee.

The legislature has given the local units what it considers to be appropriate time to adjust their procedures and take adequate steps to protect against the consequences of a change in the law of governmental immunity. It would be inappropriate for us to judicially accelerate the tort liability of counties in the present and prospective state of the law.

## II.

The theory of nuisance has been urged in the Courts of Tennessee for many years, in an effort to circumvent the bar of governmental immunity. In many of the reported cases, the conclusion that the condition of the roadway or bridge complained of constituted a trap was alleged in support of the nuisance theory.

In *Vance v. Shelby County*, 152 Tenn. 141, 273 S.W. 557 (1925), the missing bridge was alleged to be a dangerous pitfall, snare, death trap and nuisance. In *Buckholtz v. Hamilton County*, 180 Tenn. 263, 174 S.W.2d 455 (1943), an overflow of "clear" water across the highway that was said to appear innocuous but was alleged to be a death trap in support of the theory that the creation of a nuisance on the public road by the county superseded the bar of sovereign immunity.

Both *Vance* and *Buckholtz* reject the nuisance theory, as have other reported cases too numerous to mention. In short, counties, as distinguished from municipalities, have consistently avoided liability in such circumstances.

The history of tort liability of municipalities for negligence in the construction and maintenance of streets is contra. Cities were judicially declared responsible in tort

for failure to keep roads in good repair as early as 1839 and the duty was statutorily imposed in 1913, along with a notice requirement.

In *The Metropolitan Government of Nashville and Davidson County, Tennessee v. Allen*, 220 Tenn. 222, 415 S.W.2d 632 (1967), the case history of cities and counties in this field of the law is recounted along with the reasons therefor.

There are numerous cases wherein plaintiffs have sought to extend the tort liability of cities beyond the narrow limits of negligent construction and maintenance of streets, by the use of the nuisance theory. In *Powell v. City of Nashville, et al.*, 167 Tenn. 334, 69 S.W.2d 894 (1934), a city ordinance required a stop sign at the intersection of Second and Monroe, but the city failed to maintain the sign and its absence was said to constitute a nuisance. Obviously that theory was urged because this Court had previously held that the making and enforcing of ordinances regulating the use of the streets was a governmental function. *Town of Gainesboro v. Gore*, 131 Tenn. 35, 173 S.W. 442 (1915). The Court, in *Powell*, rejected the nuisance theory in the circumstances alleged, on the basis that the condition complained of involved an act of nonfeasance. Parenthetically, the condition complained of in this case also involves nonfeasance, not misfeasance.

### III.

The only case in this state that has discussed the trap theory, as a cause of action separate and distinct from nuisance, is *Sullivan v. Herbert*, 225 Tenn. 564, 473 S.W.2d 453 (1971). There, as in *Powell*, failure to maintain a stop sign in place was alleged to have created a dangerous condition amounting to a nuisance. After rejecting nuisance as a basis of action, in accord with *Powell*, the opinion speculates that:

". . . if this Court is to hold the failure to maintain a traffic stop sign at an intersection is actionable negligence, . . . . it must be upon a case showing that the intersection is, in fact, virtually a trap, and as such, a causative factor in the accident. . . .

Such a requirement would not be harsh in view of the present general rule against liability." 225 Tenn. 569, 570, 473 S.W.2d 455.

The Court's observation was dictum and motivated by the desire to chip away a portion of the sovereign immunity doctrine. That particular approach has not been adopted by this Court and will not be in this case, in view of the present and prospective state of the Tennessee Governmental Tort Liability Act.

In conclusion, the principles of law in *Vance* and *Buckholtz* control the disposition of this case, and similar suits against the counties of this State that have excluded themselves from the Tennessee Governmental Tort Liability Act, until January 1, 1976.

The decree of the trial court is affirmed. The costs are adjudged against appellants.

COOPER and HARBISON, JJ., concur.

HENRY and BROCK, JJ., dissent.

HENRY, Justice (dissenting).

Governmental immunity is a cankered, corroded and corrupted area of our law. It is the flaming sword used by cities and counties in Tennessee to banish the innocent victims of their wrongs and deny them their traditional day in court. It has become the hallmark of governmental irresponsibility—the defense by which governmental entities stoop to conquer their own citizens.

It was with tremendous pride that I concurred in *Johnson v. Oman Construction Company, Inc.*, 519 S.W.2d 782 (1975), wherein this Court unanimously denounced the doctrine of sovereign immunity as "an anachronism" and as "at variance with modern concepts of justice." In effect, we said that we would give the legislature an opportunity to act, with the clear implication that if it did not we would. We recognized the Governmental Tort Liability Act

(§ 23–3301 et seq. T.C.A.) and commented upon this Act:

> We do not regard this statute as dealing with the subject in a *complete and comprehensive manner*. We are reluctant to take judicial action in this area, however, *without giving the General Assembly* an opportunity to establish *a comprehensive and uniform tort claims procedure* governing suits against cities, counties and other political subdivisions or their agencies in the duly constituted courts of the state. (Emphasis supplied). 519 S.W.2d at 786.

I wish to make it a matter of record that my concurrence was based upon an honest belief that if the legislature did not establish a "comprehensive and uniform" tort claims procedure, this Court would abrogate governmental immunity. We recognized and held, in effect, that the Governmental Tort Liability Act was neither comprehensive nor uniform.

Subsequent to *Johnson v. Oman*, the legislature adopted Chapter 252 of the Public Acts of 1975 which removed the option of local governments to exempt themselves from the application of the law, effective 1 January 1976. This made the law uniform but did not make it comprehensive and, of course, continued immunity for all cities and counties not electing to come under it until 1 January 1976.

Again in *City of Memphis v. Roberts*, 528 S.W.2d 201 (1975), this Court, addressing the statute waiving the immunity of cities and counties with respect to tort actions based upon the action of police officers, sheriffs, etc., unanimously declared:

> Section 6–640 T.C.A. was wholesome legislation, designed for the partial correction of a problem which *exists without* justification or excuse, and, as Justice Harbison so eloquently stated in *Johnson v. Oman Construction Co.*, 519 S.W.2d 782, 786 (1975), is "at variance with modern concepts of justice." 528 S.W.2d at 205.

The profession took us at our word and in briefs and oral arguments made at the bar of this Court the lawyers of Tennessee have recognized our view that sovereign immunity is an "anachronism."

The Sixth Circuit accepted our pronouncement at face value. In *Sawyer v. Methodist Hospital, et al.*, 522 F.2d 1102 (1975) that Court said:

> We recognize that in *Johnson v. Oman Construction Co.*, 519 S.W.2d 782, 786 (Tenn.1975), the Tennessee Supreme Court expressed its dissatisfaction with the doctrine of sovereign immunity. Nevertheless, the court affirmed the dismissal of certain claims on the basis of governmental immunity, concluding that the doctrine should not be abrogated judicially without affording the Legislature an opportunity to act on this issue. Thus it appears that Tennessee may join the growing number of states that have abolished or substantially modified sovereign immunity.

I had thought that *Johnson v. Oman* sounded the death knell of governmental immunity in Tennessee, but our decision today restores it to a robust condition of sound good health.

Consistency demands that I abide our admonition in *Johnson v. Oman* and the Court's hasty departure from its holding necessitates this dissent.

I.

The doctrine of sovereign immunity is deeply rooted in feudal notions of the divine right of kings. In feudal England the King was at the very pinnacle of the power structure and was answerable to no court since "the King can do no wrong". Our courts proceed upon the general assumption that sovereign immunity is an established part of our common law. Such is not the case.

*Sixteen years after* the men of the Watauga settlement organized the Watauga Association and adopted the first written constitution (1772) to be prepared on American soil and adopted by native Americans,

who sought to remove themselves from the rule of British Colonial governors—

*Twelve years after* the American Colonies separated from the mother country by the adoption of their Declaration of Independence (1776)—

*Eleven years after* the Articles of Confederation were agreed to by the Continental Congress (1777)—

*Eight years after* the adoption of our Cumberland Compact (1780)—

*Seven years after* the Articles of Confederation were ratified (1781)—

*Three years after* the Constitution of the State of Franklin was adopted (1785)—

And *one year after* the Constitution of the United States was written (1787)—

And *after* Tennessee had adopted "the common law of England, as it stood at and before the separation of the colonies" [*Quarles v. Sutherland*, 215 Tenn. 651, 389 S.W.2d 249 (1965)]—

A man by the name of Russell broke his wagon on a British Bridge and there ensued the historic case of *Russell v. Men of Devon*, 2 Term.Rep. 667, 100 Eng.Rep. 359 (1788). Thus the putative ancestor of governmental immunity came into being and thus was the English Common Law established—after we were no longer a part of England had severed all ties therewith.

As the style indicates this was a suit against the inhabitants of an unincorporated county.

This case turned on the propositions that it involved an unincorporated county having no corporate fund and no means of obtaining one; that it is better that an individual should sustain injury than that the public suffer inconvenience; and upon lack of precedent and fear of a multiplicity of suits.

It is an interesting footnote to history that his Majesty, George III sat on the throne of England when Russell was decided. He was another king who could do not wrong.

He has been called "the most famous case of manic-depressive insanity." From time to time it was necessary that he be restrained by a straight jacket. His first attack came in 1765, when he was 27 years old. His second and most severe attack came when he was 50 years old and, oddly enough it was in that *same year, 1788*, that *Men of Devon* was decided.[1]

To say that the King can do no wrong is to ignore Tudor despotism, royal roguery and every fact of an unsavory history of the Kings of England, at least up through George III which is the period here in question.

The Declaration of Independence recites:

The history of the present King of Great Britain is a history of repeated injuries and usurpations.

Thereafter, this magnificent declaration of our separation, absolving ourselves from all allegiance to the British Crown, lists 27 specific abuses and wrongs committed by a king who could do no wrong.

To say that we adopted as a part of our American Heritage, this portion of the common law representing the type of injustice from which we fled, is to ignore every fact of history and every facet of our early American aims and objectives.

And, of course, like so much of English law that we have so much difficulty in discarding, the rule of governmental immunity has long since ceased to exist in England.

## II.

In 1812 when we were again at war with England—while an insane king who could "do no wrong" was ruling by regency and impressing our seamen on the high seas—a man named Mower moved his horse onto the Leicester Bridge with the result that the horse's hoof hit a hole and the horse died.

1. *Guttmacher and Weihafen, Psychiatry and the Law.  W. W. Norton & Co.*

The Massachusetts Court, in *Mower v. Inhabitants of Leicester*, 9 Mass. 247 (1812), immortalized the horse by resurrecting and revising the rule in *Men of Devon* and misapplying the same with the result that between the hoof of the horse and the mouth of the court a precedent was set which has plagued the profession, perverted justice and tormented the courts for more than sixteen decades.

There is a unanimity of agreement that this is the American ancestor of the immunity rule as we know it today.

Both *Men of Devon* and *Mower* have been widely criticized.

Professor Barnett, writing in 16 Ore.L. Rev. 250 (1937), refers to *Mower* as:

.   .   .   a sorry application of the *Russell* case  .   .   .  a combination of misguided logic and misapplied precedent.

In *Stone v. Arizona Highway Commission*, 93 Ariz. 384, 381 P.2d 107 (1963), the Court said that these two cases:

(h)ave set the tumbleweed in motion and nearly every state adopted the same theory as to sovereign liability for torts of its agents or employees. [citations omitted]. Even though this doctrine has subsequently been overruled in England, the rule still exists in most of the states of this country.[2]  381 P.2d at 110.

In *Spanel v. Mounds View*, 264 Minn. 279, 118 N.W.2d 795 (1962), the Court said:

It was on this shaky foundation that the law of governmental tort immunity was erected in Minnesota and elsewhere.  118 N.W.2d at 797.

### III.

We turn now to Tennessee, where the doctrine exists upon the quite erroneous and somewhat novel basis that somehow the state's immunity trickles down to cities and counties and, therefore, they, as "arms of the state", are also immune.  This insistence will not withstand critical analysis for two reasons.  First, the Constitution of Tennessee gives the state no absolute immunity and second, it gives the cities and counties no immunity.  Assuming arguendo that the state is immune, it is sheer sophistry to say that Tennessee cities and counties also partake of the state's sovereignty and as sovereigns are immune.  This awkward theory borders on the ludicrous when we attempt to draw the illusory and elusive distinction between governmental and propriety activities.

Tennessee's first constitution became effective on 1 June 1796.  Article XI, Section 17, provided in pertinent part:

Suits may be brought against the State in such manner and in such courts as the legislature may by law direct: *Provided, The right of bringing suit be limited to the citizens of this State.* (Emphasis supplied).

In Shannon's *Annotated Constitution of Tennessee* at page 148, it is suggested that the last proviso was "probably omitted because it was considered to be ineffectual and invalid."  At any rate, it does not appear in subsequent constitutions.

In the constitutions of 1834 (actually 1835 —it became effective 27 March 1835) and 1870 (effective 5 May 1870) the Declaration of Rights is transferred from Article XI to Article 1.  Section 17 of each Article simply provides, in this regard that:

Suits may be brought against the State in such manner and in such courts as the legislature may by law direct.

The construction of this section does not require brilliance—just intellectual honesty.  Clearly the authors of our Constitution have said in plain, simple and unambiguous terms that the state may be sued, leaving it to the legislature—not to determine whether—but the manner or procedure to be followed and to identify the appropriate courts.  It is arguable that once the legisla-

---

**2.**  *Stone* was decided in 1963.  At this time the majority of American jurisdictions had discarded governmental immunity.

ture has established courts, delineated their jurisdiction and outlined their procedures, the Constitution has been satisfied. It is not arguable, in my view, that the legislature has the right to nullify the Constitution by providing that suits may not be brought against the state.

The determination of our earlier courts on the matter of governmental immunity is *of controlling significance.*

The case of *Mayor of Memphis v. Lasser,* 28 Tenn. 757 (1849) was decided in the fifty-third year of our statehood. This was tort action against the City of Memphis seeking damages for personal injuries sustained when plaintiff fell into a deep well or cistern dug by the city at the intersection of two public streets.

The Court held:

(I)t is well settled at this day, both in England and America, that such a corporation (municipal) is *liable to be sued in actions of tort in like manner* as natural persons. (emphasis supplied). 28 Tenn. at 760.

It has always been a matter of peculiar interest, and admittedly some frustration and chagrin, to the author of this dissent that this court in *Coffman v. City of Pulaski,* 220 Tenn. 642, 422 S.W.2d 429 (1967) did not quote the foregoing language from *Lasser,* although it quoted extensively from that case. Nor did it quote the clincher conclusion of *Lasser*:

Municipal corporations are likewise liable for the wrongful acts and neglects of their servants and agents, *upon the same grounds, in the same manner, and to the same extent as natural persons.* (emphasis supplied). 28 Tenn. at 762.

Who were the authors of this clear rejection of the doctrine of sovereign immunity? We think it material that they be identified.

Tennessee's three judge[3] Supreme Court at that time was composed of Nathan Green, William B. Turley and Robert J. McKinney.

The name of Nathan Green is synonymous with superior legal craftsmanship in Tennessee. He was described by Dr. Robert H. White, Tennessee's noted historian, as "one of the most illustrious men who ever occupied a position on the bench of the Supreme Court of Tennessee". See *Messages of the Governors of Tennessee,* Volume Two, page 417. After his voluntary retirement in 1852 he was associated with Tennessee's historic Cumberland University Law School. Unto this day his fame as a lawyer, judge and teacher of law has endured. Surely, he was a giant of the Tennessee legal profession.[4]

Judge William B. Turley was from Clarksville. Goodspeed instructs us (page 394) that "his opinions are distinguished for their perspicuity, polished language and exact and logical reasoning".[5]

Judge Robert J. McKinney, of Greene County, served in the Constitutional Convention of 1834 and reference to its journal will document the fact that he was an active, informed and influential member of that body. Goodspeed instructs us (page 395) that "of the long list of illustrious names engraven in its temple of fame, none occupy a higher position than that of Robert J. McKinney."

This was truly a remarkable court. Had there been any substance to any suggestion of sovereign immunity they would have known and recognized it. Had it been a part of our common law they would have applied it. Had there been any suggestion that the state's immunity, if any, inured to the benefit of cities and counties they would have so held. Had there been any semblance of validity to the "arm of the

---

3. The Tennessee Supreme Court was composed of only three judges from 1827 until 1860.

4. He was the grandfather of the late Chief Justice Grafton B. Green.

5. Goodspeed's History of Tennessee from Earliest Times to Present (1887).

state" theory, they would have applied it. Instead these three distinguished justices, speaking through Justice McKinney, who helped write the constitution, flatly rejected sovereign immunity by holding that a Tennessee Municipal Corporation was "liable to be sued in actions of tort in like manner as natural persons."

Seven years after *Lasser* came *Cole v. Corporation of Nashville*, 36 Tenn. 162 (1856). The court proclaimed the law to be:

(T)hat corporations are liable for the wrongful acts and neglect of their officers and agents in the course and within the scope of their employment upon the same grounds, in the same manner and to the same extent that natural persons are liable for wrongs and negligence of their servants and agents. 36 Tenn. at 166.

The opinion by Justice McKinney was concurred in by Justices Harris and Robert L. Caruthers.

Justice Robert Looney Caruthers succeeded Judge Nathan Green. Goodspeed (page 395) tells us he was the "best advocate Tennessee ever produced." He was a remarkable man. During the War between the States he was elected Governor of Tennessee, but did not take office. See Moore, *Tennessee, The Volunteer State*, p. 521. Like Judge Green he devoted his time after leaving the bench to teaching law at Cumberland University.

Again we have no sophisms and sophistries. Just hard-core law. Tennessee knew not sovereign immunity constitutionally or under the common law.

Ten years later, *in the seventieth year of our statehood*, there came before the court the case of *Pesterfield v. Vickers*, 43 Tenn. 205 (1866). This was an action for assault and battery committed by a policeman. The court alluded to two Tennessee cases, viz: (1) *Humes v. Knoxville*, 20 Tenn. 403 (1839) wherein the court held that Knoxville, as proprietor of its streets, was answerable for damages incurred by a private citizen, and (2) *Lasser.*

The Court held:

(T)hat a municipal corporation is not liable for the wrongful acts of its officers. 43 Tenn. at 213.

Neither *Humes* nor *Lasser* support such a holding.

The court cited also a Massachusetts case which was based upon "a sorry misapplication" of the *Russell* case.

Thus it was that in the seventieth year of our statehood, seventy-eight years after *Russell v. Men of Devon, supra,* there came into being in Tennessee the court decreed doctrine of governmental immunity.

*Pesterfield* suggests no constitutional question.

It was not even hinted that the city was an "arm of the state".

It was not suggested that the common law was involved.

In fact, governmental immunity, per se, was not discussed.

The origin of the municipal immunity rule as it exists in Tennessee today, with its blurred distinctions, gray area differentiations and casuistic conclusions, is the case of *Memphis v. Kimbrough*, 59 Tenn. 133 (1873).

This is the first Tennessee case to draw a distinction between "corporate" and "public" duties. This case, as others which follow its reasoning, wholly fails to point out why a municipality is an arm of the state when exercising governmental functions and is not when exercising proprietary functions. Subsequent decisions of the courts are similar studies in frustration. This distinction, to quote Abraham Lincoln (on the sophism of an adversary) is "as thin as the boiled shadow of a homeopathic pidgeon".

In the 109 years that have intervened since *Pesterfield* the Tennessee Supreme Court has never explained why governmental immunity exists and has never examined the arguments of history and policy as to its validity. I have not overlooked *Coffman, supra.* The immunities were simply adopted because some other states and

some text writers sustained them. They stayed here merely because they were here.

Parroting previous holdings has produced ludicrous results. A city is liable for negligent failure to keep its streets in safe condition, *Mayor and Aldermen of Knoxville v. Bell*, 80 Tenn. 157 (1883) but it sprinkles its streets in a governmental capacity, *Connelly v. Nashville*, 100 Tenn. 262, 46 S.W. 565 (1897). But a county maintains its roads in a governmental capacity and is immune. *Davis v. Scott County*, 222 Tenn. 559, 439 S.W.2d 102 (1969). A city is liable for a nuisance, *Chattanooga v. Dowling*, 101 Tenn. 342, 47 S.W. 700 (1898). A county is not liable for the commission of a nuisance. *Hawkins v. Dawn*, 208 Tenn. 544, 347 S.W.2d 480 (1961). The operation of a water plant is a governmental function, *Smiddy v. City of Memphis*, 140 Tenn. 97, 203 S.W. 512 (1918); it operates its water plant in a proprietary capacity, *Williams v. Morristown*, 32 Tenn.App. 274, 222 S.W.2d 607 (1949).

What a tangled web we have woven to protect and promote an unjust rule of law. All we can say with certainty is that in Tennessee today a city or county is answerable for ordinary negligence in the discharge of its corporate functions, but in its governmental capacity its employees are free to shoot fleeing misdemeants, in the back (*Coffman*); its fire department is free to fail to answer fire alarms [*Irvine v. Chattanooga*, 101 Tenn. 291, 47 S.W. 419 (1898)]; its police department may commit assault and battery [*Combs v. City of Elizabethton*, 161 Tenn. 363, 31 S.W.2d 691 (1930)]; it is free to employ a mentally ill chief of police and is unanswerable when he shoots a citizen without provocation (*Bobo v. City of Kenton*, 186 Tenn. 515, 212 S.W.2d 363 (1948). In short, the employees of Tennessee municipalities that have not elected to come under the Governmental

Tort Liability Act are free to kill, murder and commit mayhem, when the city is operating in its governmental capacity unless the city has waived its immunities or unless a nuisance is created. And as I read the law, counties enjoy absolute and unqualified immunity in virtually all their operations.

They may be "low grade" corporations *Chandler v. Davidson County*, 142 Tenn. 265, 218 S.W. 222 (1919), but they enjoy high octane immunity status.

This is the unholy state of the law of our State today, brought on by blind adherence to an indefensible system of court-licensed negligence with attendant chaos and confusion, both in reasoning and in results.

This is the *anachronism* we spoke of in *Johnson v. Oman Construction Company*, *supra*, which my brothers of the majority would perpetuate.

IV.

Other American jurisdictions have weighed sovereign immunity in the balances and have found it wanting. The first assault upon the citadel was made in Florida in 1957 and resulted in the landmark case of *Hargrove v. Cocoa Beach*, 96 So.2d 130, 60 A.L.R.2d 1193 (Fla.1957). Since that time a majority of American jurisdictions have followed suit,[6] the latest being New Mexico, which held in *Hicks v. New Mexico*, 544 P.2d 1153 (New Mexico 1975) that sovereign immunity is no longer a valid defense in tort actions against the state or its political subdivisions.

A fairly recent landmark decision made by the Supreme Court of Pennsylvania in *Ayala v. Philadelphia Board of Public Education*, 453 Pa. 584, 305 A.2d 877 (1973). The crux of the court's holding, in a masterful opinion by Justice Roberts, is contained in the following sentence from the opinion:

**6.** Abolished by judicial decision in Alaska, Arizona, California, Colorado, Florida, Idaho, Illinois, Indiana, Kentucky, Louisiana, Michigan, Minnesota, Nebraska, Nevada, New Jersey, Rhode Island, Wisconsin, Pennsylvania, District of Columbia and New Mexico. Abolished by statute in Hawaii, Iowa, New York, Oklahoma, Oregon, Utah and Washington.

We now hold that the doctrine of governmental immunity—long since devoid of any valid justification—is abolished in this Commonwealth. 305 A.2d 878.

I had dared to hope and believe that someday we might close out an opinion of this court with similar phraseology. Such result would cause the profession and the public to exclaim "we have a great Supreme Court". Moreover, and of more importance, it would be just.

I condemn sovereign immunity. I believe that justice demands, reason dictates, morality mandates and elemental consideration of conscience decree a change in confidence in the quality of justice, which according to Daniel Webster, is "man's greatest interest on earth". Man's eternal quest for justice is of equal dignity with his search for certainty.

I would condemn this legal monstrosity to the oblivion which it so richly deserves.

I am authorized to state that Mr. Justice BROCK joins in this dissent.