# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-2466

_____

|  |  |  |
|---|---|---|
| Nicholas Dennen, | * | |
| | * | |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the |
| City of Duluth; S.R. Peterson; | * | District of Minnesota. |
| John Does, | * | |
| | * | |
| Appellees. | * | |
| | * | |

_____

Submitted:  March 14, 2003

Filed:  November 25, 2003

_____

Before WOLLMAN, RICHARD S. ARNOLD, and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

While being followed by a City of Duluth Canine Unit, Nicholas Dennen fell into a ravine, sustaining serious injuries. He filed suit, alleging violations of 42

U.S.C. § 1983 and Minnesota state law. Upon the appellees' motion, the district court[1] granted summary judgment in their favor. We affirm.

## I.

At the time of the accident, Dennen was a twenty-year-old University of Minnesota-Duluth honor student and football-team member. On the evening of September 26, 1998, Dennen attended a college party at 209 South 16th Avenue East in Duluth and consumed a large amount of alcohol. At approximately 1:35 a.m., City of Duluth police officers received a complaint alleging underage alcohol consumption at the party. Officer Tanski[2] first encountered Dennen, who he described as "extremely intoxicated with red, bloodshot eyes, slurred speech, and poor balance." Tanski instructed Dennen to take a preliminary breath test, which another officer was administering to other party participants outside. Dennen did not comply. Instead of taking the test, Dennen went upstairs. When Tanski searched upstairs, he found Dennen attempting to hide underneath a futon bed. Tanski repeated his instruction to Dennen to return downstairs and take the breath test. Dennen again did not comply and left the house.

At approximately 2:30 a.m., Officer Steven Peterson, who was on a routine patrol, saw Dennen walking north on 13th Avenue East about three blocks from the party location. Peterson was heading the opposite direction on the same street at the time. Citus, a police dog, accompanied Peterson in the patrol car.

According to Peterson, he observed Dennen behave curiously as Peterson drove by. Dennen carried a suspicious, but unknown object–possibly a white plastic bag. Peterson noticed that Dennen repeatedly glanced at him in a nervous fashion,

---

[1] The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota.

[2] There is no first name in the record for Officer Tanski.

and then moved his hand in order to conceal the object he carried. Suspicious, Peterson turned his vehicle around to get a closer look. Immediately, Dennen sprinted to the intersection of 13th Avenue East and East Fourth Street and then headed east. Peterson completed his U-turn and followed. However, when Peterson arrived at the intersection, Dennen had disappeared.

Peterson surveyed the area and surmised that Dennen must have returned south through the backyards of the homes on 13th Avenue East. At exactly 2:36:48 a.m. Peterson radioed the situation to the station, stopped his car, and decided to investigate. Peterson went on foot and brought Citus with him–as Peterson put it–for his own protection: "it was dark, the backyard areas were unfamiliar," and he was in an area known for some criminal activity. Moreover, he "was unsure of who the individual was, and what, if anything he was carrying." Because he was not tracking or apprehending Dennen, Peterson did not put Citus on a leash nor give him any commands.[3]

Peterson and Citus began to look for Dennen. After a few moments, Citus stopped and indicated that he had picked up a human scent from an unexpected direction–away from the houses and toward a wooded area. Citus and Peterson changed course to follow this scent. As they were running, Citus ran some distance ahead of Peterson–approximately fifteen-to-thirty feet. However, as soon as Citus entered the wooded area, Peterson commanded him to return. Citus slowed his pace, and then returned to Peterson. Upon Citus's return, Peterson leashed him.

At this point, Peterson and Citus were standing about fifteen-to-twenty feet from the edge of the wooded area. Peterson then heard movement from that area. He

---

[3] The City of Duluth has no policy regarding whether a dog must be on a leash when tracking a suspect. According to the testimony of several witnesses, if a canine is tracking a suspect, he will usually be on a leash.

identified himself, announced Citus's presence, and ordered whomever was hiding in the woods to come out. Shortly after Peterson's announcement, Peterson heard the sounds of breaking brush and a loud crash. Peterson and Citus entered the woods. After doing so, Peterson and Citus came to the edge of a deep, muddy, and steep ravine. They descended about fifteen feet and then saw Dennen lying face-down in a creek bed, which was an additional thirty-five feet below them.

At 02:38:06 a.m. Peterson radioed the dispatcher and requested medical assistance. Tanksi and Officer M. Peterson[4], the two officers who were at the party, left the house and headed toward the river. After descending into the ravine, they found Dennen seriously injured. The officers attempted to resuscitate Dennen. Dennen was rushed to the hospital for treatment. Unfortunately, Dennen had suffered a severe head injury and remained in a coma for several weeks.

Toxicology reports later revealed the presence of barbiturates, amphetamines, and an alcohol level of .227 in Dennen's blood. Medical records reflected that Dennen had multiple small lacerations on his upper right arm, small abrasions and scratches on his elbows and forearms, and abrasions and punctures on both elbows and his left wrist. Dennen has no recollection of the events of September 26, 1998.

Dennen spent over a year in rehabilitation, and, although he has regained many of his physical and mental abilities, he still suffers from some of the effects of the brain injury. As a result, Dennen sued–among others–Peterson and the City of Duluth, alleging violations of 42 U.S.C. § 1983 and Minnesota state law. The City and Peterson moved for summary judgment, which the district court granted.

Dennen appeals the district court's summary-judgment order. Dennen first claims that Peterson's deployment of Citus without a leash was an excessive use of

---

[4] This officer is unrelated to Steven Peterson.

force in violation of the Fourth Amendment, thus creating § 1983 liability. He also argues that the deployment was a violation of Minnesota state law.[5] Peterson denies these allegations and argues that he is protected under the doctrines of qualified immunity for his federal acts and official immunity for his state acts. We affirm.

## II.

"We review de novo a grant of summary judgment, applying the same standard as the district court." *Forrest v. Kraft Foods, Inc.*, 285 F.3d 688, 691 (8th Cir. 2002) (citation omitted). "Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Thomas v. Union Pac. R.R. Co.*, 308 F.3d 891, 893 (8th Cir. 2002) (citation omitted). In this diversity case, we also review the district court's interpretation of state law de novo. *Walk v. Starkey Mach., Inc.*, 180 F.3d 937, 939 (8th Cir. 1999) (citations omitted).

## A.

Dennen first argues that the district court committed error when it granted summary judgment in favor of Peterson on his 42 U.S.C. § 1983 claim. In order to survive a motion for summary judgment under § 1983, Dennen must "raise a genuine issue of material fact as to whether (1) [Peterson] acted under color of state law, and (2) the alleged wrongful conduct deprived [Dennen] of a constitutionally protected federal right." *Kuha v. City of Minnetonka*, 328 F.3d 427, 432 (8th Cir. 2003) (citation omitted). Peterson was acting under color of state law. Thus, this case turns

---

[5] Below, Dennen also alleged that Peterson's conduct violated the Fourteenth Amendment; challenged the City's "use-of-force" policy and guidelines; and argued that the City should be vicariously liable for any state-law torts of Peterson. The district court denied each of these arguments. Dennen does not appeal those determinations.

on whether he deprived Dennen of his constitutional rights–specifically his Fourth Amendment right not to be subjected to an excessive use of force.

On appeal, Dennen specifically argues that Peterson used an excessive amount of force when he brought Citus with him off his leash after exiting the car. This excessive force claim "is analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Kuha*, 328 F.3d at 434 (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). This test "is not capable of precise definition or mechanical application." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). "[I]ts proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citation omitted). In sum, "the nature and quality of the intrusion on the individual's Fourth Amendment interests [must be balanced] against the importance of the governmental interests alleged to justify the intrusion." *United States v. Place*, 462 U.S. 696, 703 (1983).

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation." *Id.* at 396–97. Thus, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. (citations omitted). Finally, "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.* (citations omitted).

Dennen does not cite and we have discovered no case that holds that it is a per se excessive use of force to use a canine without a leash.[6] Moreover, it would not be practical to require a police officer to always have his canine on a leash. There are a variety of instances when it would not be appropriate to do so. For example, there is no need to have a canine on a leash if an officer is talking to children in a school, or when the dog is sniffing for contraband. Particularly, a leash would not be required in circumstances where officer safety is concerned.

The key inquiry is whether using a dog without a leash was objectively reasonable under the circumstances. In reviewing Dennen's claim, the substantive law must be applied in the context of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Thus, the relevant inquiry is whether Dennen presented enough proof in support of his claim that a jury could properly find that the degree of force used against him was not "objectively reasonable." On the basis of the present record, we conclude that Dennen did not submit sufficient proof to create a genuine issue of material fact regarding the degree of force.

To establish unreasonableness, Dennen relies upon the opinion of his expert in the area of police canine training, VanNess H. Bogardus, III. In his report, Bogardus states:

---

[6] Dennen relies on *Vathekan v. Prince George's County*, 154 F.3d 173, 178–79 (4th Cir.1998). Dennen's reliance on *Vathekan* is misplaced. In *Vathekan,* a police officer released a police canine in a house with the specific command "Find Him!" *Id.* at 178. The police canine eventually found and bit an innocent bystander who was in an upstairs bedroom of the house. *Id.* The key fact in *Vathekan* was that the police officer intentionally deployed the canine to find and apprehend persons in the house. In this case, however, Citus was never deployed.

> [I]t is generally agreed among law enforcement agencies that when, in the course of a criminal investigation or arrest, an officer releases a dog[, it is] with the knowledge that the dog will probably bite anyone that it finds. . . . This is part due to the fact that with dogs that are trained to bite and hold, the "attack" command is contained within the "send" command as a part of the dog's training.

App. at 297–98. This is a true statement as far as it goes. The canines in the Duluth police department were trained to "bite and hold." However, as Dennen has conceded, dogs trained in this method must first be given a command before they will "bite and hold" a suspect. According to the undisputed record in this case, at no time did Peterson give Citus a command to attack, send, or seek.

Peterson stated that he initially did not leash Citus because he wanted to have both hands free in case he should need to use them. Given that Peterson had only a few moments to make a decision, Peterson's actions were objectively reasonable. Peterson had a concern for his own safety. He was walking at night in a dark area behind houses in a part of town known for some rowdiness and criminal activity. The person that he wanted to question had just disappeared after behaving curiously. He did not know if that person had a weapon or would jump out at him from behind a house.

Unfortunately, Dennen cannot remember any events to directly contradict the testimony of Peterson. Instead, he attempts to contradict Peterson's testimony through several bits of circumstantial evidence, specifically: (1) hospital nurse reports which show that Dennen had puncture wounds and lacerations; (2) Dennen's testimony that his parents told him that an unidentified doctor told them that the marks on his arm "could have been from a dog"; (3) Bogardus's expert testimony that the pictures of Dennen's injuries, which he had viewed, were consistent with a police canine-bite.

However, this testimony does not contradict Peterson's testimony regarding why he brought Citus along with him off leash. Instead this evidence relates to whether or not Citus bit Dennen. In this context, whether Citus bit Dennen is irrelevant. Our question is whether it was an excessive use of force for Peterson to have taken Citus with him off leash. If having an unleashed dog could be excessive force, then Peterson would be liable regardless of whether Citus bit Dennen or whether Citus only caused him to flee and fall into the ravine. Thus, Dennen has not presented any evidence to contradict Peterson's testimony regarding his use of Citus off leash. And, because the uncontested testimony demonstrates that such use was at that time objectively reasonable, we affirm the district court's denial of Dennen's § 1983 claim.

B.

Dennen also appeals the district court's grant of summary judgment for Dennen's state-law tort claims of negligence and negligent infliction of emotional distress against Peterson. Specifically, Dennen presented evidence that on two previous occasions Citus bit others and that Citus growled at others when they fed him. Thus, Dennen alleges Peterson was negligent when he used Citus without a leash because Citus had a predisposition to bite others even without command to do so. Assuming that Dennen could have proven these tort claims–a difficult task because the two instances of biting took place after the events in this case–they would nonetheless fail because Peterson is "officially immune" from such liability. In Minnesota, generally a public official charged by "law with duties calling for the exercise of discretion is not personally liable to an individual for damages." *Kelly v. City of Minneapolis*, 598 N.W.2d 663, 664 (1999) (citation omitted).

There are two exceptions to the general rule. First, Peterson may not claim official immunity if the duty he performed was ministerial instead of discretionary. *Id.* Ministerial duties are "absolute, certain, and imperative and involve merely execution of a specific duty arising from fixed and designated facts"; they are "simple

and definite, leaving nothing to the discretion of the official." *Id.* (citation and alterations omitted). *Id.* Dennen concedes that Peterson's act, for the events in question, were discretionary.

Alternatively, Peterson may not be protected under official immunity if he performed his official acts with malice. "Malice in the context of official immunity means intentionally committing an act that the official has reason to believe is legally prohibited." *Id.* at 663 (citation omitted). Or, in other words, it is the "willful violation of a known right." *Rico v. State*, 472 N.W.2d 100, 107 (Minn. 1991). Dennen produced no evidence to suggest that Peterson "willfully violated" Dennen's known rights. As mentioned previously, no case has held that it is a per se excessive use of force in violation of the Fourth Amendment when an officer brings a dog with him off leash.[7] As a result, Peterson had no reason to believe that such an act was legally prohibited. Therefore, Peterson is entitled to official immunity on the state law claims. *Nelson v. County of Wright*, 162 F.3d 986, 991 (8th Cir. 1998).

## III.

For the foregoing reasons, we affirm the judgment of the district court.

_____

---

[7] Dennen also argues that Peterson knew that the use of Citus violated the City's use-of-force policy and was an excessive use of force because Citus had a predisposition to bite without command. However, this is unsupported by the record. As mentioned previously, the two instances of Citus's biting took place after the events of this case. The only incident that took place before this case involved Citus's growling during feeding time. Citus's growling is not sufficient to put Peterson on notice that Citus might not follow commands.