**Lena M. HYATT, Respondent,**

v.

**ANOKA POLICE DEPARTMENT, et al., Appellants.**

No. A03–1707.

Court of Appeals of Minnesota.

May 25, 2004.

Review Granted July 20, 2004.

Robert F. Mannella, Babcock, Neilson, Mannella, LaFleur & Klint, Anoka, MN, for respondent.

Paul D. Reuvers, Jason J. Kuboushek, Iverson Reuvers, LLC, Bloomington, MN, for appellants.

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

Considered and decided by RANDALL, Presiding Judge, KLAPHAKE, Judge, and FORSBERG, Judge.*

## OPINION

KLAPHAKE, Judge.

After a police dog bit her during the arrest of her husband, respondent Lena M. Hyatt sued appellants, the Anoka Police Department and the City of Anoka (collectively referred to as the city), under the "dog bite" statute, Minn.Stat. § 347.22 (2002). The city moved for summary judgment, arguing that (1) the dog bite statute, which imposes strict liability upon the owner of a dog for injuries caused to a person, does not apply to police dogs; (2) the city is entitled to statutory immunity for its decision to own police dogs; (3) the city is entitled to vicarious official immunity for the actions of its police officer; and (4) the police department is not a legal entity subject to suit. The district court rejected the city's arguments and denied its motion for summary judgment. The city appeals.

Because the legislature did not intend to apply the dog bite statute to police dogs, the city is entitled to a grant of summary judgment and dismissal of the claim against it. We therefore reverse the district court's decision.

## FACTS

On May 21, 2002, at approximately 2:00 a.m., four law enforcement officers arrived at a residence in St. Francis to execute two arrest warrants on respondent's husband, Andrew Hyatt, for controlled substance and fleeing a peace officer. The arrest team consisted of a police officer from St. Francis; two Anoka County Dep-

Minn. Const. art. VI, § 10.

uty Sheriffs, Paul Lenzmeier and Todd Diegnau; and City of Anoka Police Officer Mark Yates and his police dog, Chips.

The homeowner informed the officers that Andrew Hyatt was living with respondent in a barn behind the main residence. The officers approached the barn, knocked on the door several times, and called for Andrew Hyatt to step out. After receiving no response, the officers entered the building and came upon another man, Adam Zugschwert, who advised them that Hyatt was in the upstairs loft. By that time, the officers heard some movement upstairs.

The officer from St. Francis remained with Zugschwert. Officer Yates and Chips remained outside in case Andrew Hyatt fled, while Deputies Lenzmeier and Diegnau went upstairs. The deputies saw two individuals lying in bed underneath a blanket. They told the individuals to sit up and show their hands, but the individuals did not respond. Because of the two outstanding felony warrants and because the deputies were unable to tell what the individuals were holding in their hands, they had their guns drawn.

Lenzmeier pulled the blanket down and Andrew Hyatt jumped out of bed, yelling "Go ahead, just shoot me, shoot me!" Hyatt took a swing at Lenzmeier and missed; Lenzmeier pushed him away, towards Diegnau. Hyatt struck Diegnau in the face and again in the mouth as Diegnau attempted to subdue him.

During the struggle, Yates, who was outside with Chips, heard a woman screaming at the deputies in a threatening tone to get out of the apartment. Yates also heard what sounded like a fight occurring upstairs. When he heard someone call for assistance, he and Chips went upstairs.

According to respondent, Andrew Hyatt fled the scene prior to the time Yates and Chips arrived upstairs. Respondent claims that when Yates released Chips, the dog immediately charged her rather than chasing her fleeing husband. Respondent claims that the dog pounced on her and bit her repeatedly in the arm and leg before Yates controlled him.

According to Yates, however, when he got upstairs, he saw a woman standing in the middle of the room, a man behind her, and the deputies standing off to the side somewhat behind him. Diegnau was injured, with a large amount of blood coming from his nose and mouth.

When Yates saw Andrew Hyatt run out through a door, he gave verbal commands and released Chips from his lead. At that moment, according to Yates, respondent was either pushed by Andrew Hyatt or voluntarily stepped in front of Chips, who took her down to the ground and bit her. Yates decided to follow Hyatt and did not immediately release Chips.[1] Yates jumped on Hyatt's back in an attempt to tackle him, but Hyatt went through the doorway into a small porch area and threw himself through a second story window. Yates went halfway through the window before he caught himself on the ledge area. Andrew Hyatt continued to the ground and fled on foot.

Yates then returned to the other room and immediately released Chips, who was still holding onto respondent. Yates explained that he did not release Chips immediately because there wasn't time.

Andrew Hyatt was apprehended approximately 15 minutes later. Respondent was taken to the hospital with lacerations on her left leg and right arm. She thereafter

---

1. Chips was trained in the "bite and hold" method of apprehension, which means that he will hold onto a suspect until ordered to release.

brought this suit against the city under the dog bite statute.

## ISSUE

Did the district court err in determining that the dog bite statute imposes strict liability on the city as the owner of a police dog?

## ANALYSIS

 "On an appeal from summary judgment, this Court determines whether there are genuine issues of material fact and whether the district court erred in applying the law." *Watson v. Metro. Transit Comm'n,* 553 N.W.2d 406, 411 (Minn.1996). The issue of whether immunity applies is a legal question subject to de novo review. *Gleason v. Metro. Council Transit Operations,* 582 N.W.2d 216, 219 (Minn.1998).

 This case involves the construction and applicability of a statute, which is also a question of law and is reviewed de novo. *See Brookfield Trade Ctr., Inc. v. County of Ramsey,* 584 N.W.2d 390, 393 (Minn. 1998); *O'Malley v. Ulland Bros.,* 549 N.W.2d 889, 892 (Minn.1996). A court must initially examine the language of a statute to determine its meaning and "ascertain and effectuate the intent of the legislature." Minn.Stat. § 645.16 (2002) ("When the words of a law in their application to an existing situation are clear and free from all ambiguity, the letter of the law shall not be disregarded under the pretext of pursuing the spirit."). Where the meaning of a statute is plain and unambiguous on its face, judicial construction is neither necessary nor proper. *Occhino v. Grover,* 640 N.W.2d 357, 359 (Minn.App. 2002), *review denied* (Minn. May 28, 2002). "But courts are not to give effect to the plain meaning of the statute if it produces absurd results or it is clearly at odds with the policy of the legislation as a whole."

*Swenson v. Waseca Mut. Ins. Co.,* 653 N.W.2d 794, 797 (Minn.App.2002), *review denied* (Minn. Feb. 26, 2003).

Respondent's claim against the city rests solely on the dog bite statute, which states in full:

> If a dog, without provocation, attacks or injures any person who is acting peaceably in any place where the person may lawfully be, the owner of the dog is liable in damages to the person so attacked or injured to the full amount of the injury sustained. The term "owner" includes any person harboring or keeping a dog but the owner shall be primarily liable. The term "dog" includes both male and female of the canine species.

Minn.Stat. § 347.22 (2002). The statute imposes strict liability on the owner of a dog who attacks or injures another person. The only defenses available to the owner are that the dog was provoked or that the injured person was not acting peaceably in a place where the person was lawfully entitled to be. Unlike many other cases involving personal injuries from a dog bite, respondent does not assert a negligence or excessive force claim. *See, e.g., Lewellin v. Huber,* 465 N.W.2d 62, 64 (Minn.1991); *Kuha v. City of Minnetonka,* 328 F.3d 427, 433 (8th Cir.2003).

 The district court here determined that the dog bite statute is unambiguous and that nothing in its plain language exempts police dogs. The city counters that because application of the statute to police dogs leads to absurd results, we must look beyond the plain language in order to ascertain and fulfill the legislature's intent. *See* Minn.Stat. § 645.17(1) (2002) (stating that when "ascertaining the intention of the legislature," courts may presume that "legislature does not intend a result that is absurd, impossible of execution, or unreasonable").

While the language of the dog bite statute appears clear on its face, we agree with the city that the statute's application to police dogs leads to absurd results, presumably not intended by the legislature. For instance, application of the statute to police dogs would expose a city to a strict liability claim, regardless of the reasonableness of the use of the police dog. Such a result is directly contrary to the statute that allows police to use reasonable force in the performance of their duties. *See* Minn.Stat. § 609.06 (2002) (authorizing police to use reasonable force when effecting lawful arrest or attempting to prevent person from escaping); *Dennen v. City of Duluth*, 350 F.3d 786, 790 (8th Cir.2003); *Kuha*, 328 F.3d at 433 (recognizing that use of police dogs is constitutionally and statutorily permissible, and that standard is one of objective reasonableness).

In addition, application of the dog bite statute to police dogs would hamper the ability of police to use police dogs for fear of liability. In a somewhat analogous situation, the supreme court has refused to impose strict liability on police for decisions involving high-speed chases. *See, e.g., Pletan v. Gaines*, 494 N.W.2d 38, 41 (Minn.1992); *Cairl v. City of St. Paul*, 268 N.W.2d 908, 911–12 (Minn.1978). In *Cairl*, 268 N.W.2d at 912–13, the court concluded that other statutes already impose a negligence standard of care on police when operating their vehicles in emergency situations. In *Pletan*, 494 N.W.2d at 41, the court recognized that exposing police officers to civil liability whenever a third person might be injured in a police chase would "tend to exchange prudent caution for timidity in the already difficult job of responsible law enforcement." Similarly, because the use of police dogs may be subject to negligence and excessive force claims, imposition of strict liability under the dog bite statute would render these other theories of liability useless and would hamper any decision by police to use police dogs, however reasonable.

These contradictions or absurdities lead us to examine the legislative intent of the dog bite statute. *See Wegener v. Comm'r of Revenue*, 505 N.W.2d 612, 617 (Minn. 1993). When the legislature enacted the dog bite statute in 1951, it was generally concerned with injuries inflicted by dogs, particularly injuries to "persons who come upon private residential premises lawfully." *Lewellin*, 465 N.W.2d at 65 & n. 3. The legislature clearly intended to eliminate the "one free bite" rule of common law. *Id.*

For several reasons, we infer that the legislature could not have intended to apply the dog bite statute to police dogs. According to the city, police dogs were not used in Minnesota for law enforcement until the 1960's, years after the dog bite statute was enacted. Further, the doctrine of sovereign immunity, which precluded any claims against municipalities, was not abrogated until 1962. *See Spanel v. Mounds View Sch. Dist. No. 621*, 264 Minn. 279, 292–93, 118 N.W.2d 795, 803–04 (1962). Thus, there was no reason for the legislature to specifically exclude police dogs from the dog bite statute in 1951.

We therefore conclude that the dog bite statute does not apply to police dogs and that the district court erred in denying the city's motion for summary judgment; respondent's complaint, which rests solely on the dog bite statute,[2] must be dismissed. Our decision is fully consistent with prior unpublished decisions from this court.

---

2. Contrary to the assumption made by the dissent, our decision does not necessarily preclude claims alleging excessive force or negligence based on the use or deployment of police dogs.

*See, e.g., Clingan v. Anoka County,* No. CX–02–1049, 2003 WL 139392, at *3 n. 4 (Minn.App. Jan.21, 2003) ("We are skeptical, given the high risk nature of law enforcement and the manner in which dogs are used by the police, that the legislature intended the dog bite statute to extend to police dogs. And, absent specific legislative direction, we are unwilling, given the facts of this case, to extend the reach of the statute."). And our decision follows precedent from at least one other jurisdiction. *See, e.g., Blais v. Town of Goffstown,* 119 N.H. 613, 406 A.2d 295, 298 (1979) (concluding that New Hampshire legislature did not intend to apply its dog bite statute to suits against municipalities for injuries suffered from reasonable use of police dogs).

Finally, the city has raised a number of other arguments involving its entitlement to statutory or vicarious official immunity and as to whether the police department is a legal entity properly subject to suit. Given our determination that the dog bite statute does not apply to police dogs, we need not address these additional arguments and decline to do so. *See Bruegger v. Faribault County Sheriff's Dep't,* 497 N.W.2d 260, 262 n. 3 (Minn.1993) (noting that where court determines that no cause of action exists, ruling need not be made regarding whether statutory immunity also applies).

## DECISION

Because the legislature did not intend to apply strict liability under the dog bite statute to police dogs, the district court erred in denying the city's motion for summary judgment.

**Reversed.**

RANDALL, Judge (dissenting).

I respectfully dissent and would affirm the district court. I do not find this case ripe for summary judgment. I suggest there are contested substantial fact issues. I would remand for further proceedings and leave both parties to the option of moving for summary judgment at a later date, if appropriate.

Perhaps, as to a criminal defendant, which respondent is not, the strict liability of the "dog bite" statute might not apply to police dogs as a matter of law. But I just find it difficult to believe that police dogs can willy-nilly attack and bite innocent bystanders, like respondent, at the scene of a crime and then everyone responsible for controlling the dogs gets absolved on the grounds of immunity. I suggest more discovery and perhaps even a trial on the facts are needed before it can be determined under what circumstances Chips bit respondent. Then you have the issue of why Police Officer Yates did not immediately call Chips off of respondent, but rather delayed calling Chips off and instead followed Hyatt. I suggest that the longer a trained attack dog has his teeth in a person's arm, the more severe the damage can be. If Yates's actions are found to be a malicious act, do you still have immunity, if you have immunity? *Podruch v. State, Dept. of Pub. Safety,* 674 N.W.2d 252, 254 (Minn.App.2004) (stating that the doctrine of official immunity protects from personal liability a public official charged by law with duties that call for the exercise of judgment or discretion unless the official is guilty of a willful or malicious wrong).

I conclude summary judgment for the city is inappropriate at this stage.