IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 23, 2017 Session

## HARAKAS CONSTRUCTION, INC. v. METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, ET AL.

Appeal from the Chancery Court for Davidson County
No. 13-576-IV     Russell T. Perkins, Chancellor

_____

### No. M2016-01540-COA-R3-CV

_____

Harakas Construction, Inc. appeals the judgment of the Chancery Court for Davidson County ("the Trial Court") granting summary judgment to Metropolitan Government of Nashville and Davidson County ("Metro") and Dale and Associates, Inc. ("Dale"). We find and hold that the Trial Court correctly granted summary judgment to Metro based upon sovereign immunity and that the Trial Court correctly granted summary judgment to Dale because Dale had negated essential elements of Harakas's claim.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed Case Remanded

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and JOHN W. MCCLARTY, J., joined.

J. Brad Scarbrough and Chris Holleman, Brentwood, Tennessee, for the appellant, Harakas Construction, Inc.

Jon Cooper and J. Brooks Fox, Nashville, Tennessee, for the appellee, Metropolitan Government of Nashville and Davidson County.

David N. Garst, J. Wallace Irvin, and Brian S. Faughnan, Nashville, Tennessee, for the appellee, Dale and Associates, Inc.

# OPINION

## Background

In 2007, BK Partners, LLC ("BK Partners") owned undeveloped real property located in Davidson County, Tennessee ("the Property") upon which it planned to construct a high-rise condominium. In order for the Property to be developed, the existing public sewer service had to be upgraded. The sewer system that services the Property also services an area known as the Holiday Travel Park area. In August of 2007, BK Partners submitted an application to upgrade the public sanitary sewer to Metro Water, the department of Metro which manages the water and sewer services in Davidson County, Tennessee. The application was approved.

BK Partners and Metro entered in to a Participation Agreement wherein Metro agreed to fund $200,000 toward the cost of the sewer improvement. Pursuant to Metro's policies, BK Partners was responsible for paying capacity fees based upon the anticipated impact that the new development would have on the existing sewer system. The capacity fees for the development of the Property were approximately $275,000. Subject to the passage of an authorizing ordinance, Metro agreed to waive $200,000 of the capacity fees since BK Partners was funding a portion of the sewer improvement costs, and BK Partners was to pay the balance. Metro also waived the requirement for BK Partners to post a payment and performance bond as security for the project.

In December of 2007, a Metro ordinance was approved which authorized Metro to pay an amount not to exceed $200,000 toward the sewer improvements being made by BK Partners. The ordinance, Ordinance No. BL2007-67, provided, in pertinent part:

> An ordinance authorizing the Metropolitan Government to participate with BK Partners to provide public sewer service in Davidson County to Pennington Towers Outfall-Holiday Travel Park Sewage Pumping Station Removal, Project No. 07-SL-113.
>
> WHEREAS, Pursuant to the document attached as Exhibit A and incorporated into this ordinance by reference, BK Partners proposes to provide public sewer service in Davidson County to a development known as Pennington Towers Outfall-Holiday Travel Park Sewage Pumping Station Removal, Project No. 07-SL-113, Map 62.1, Parcels 17 & 22; and
>
> WHEREAS, the Metropolitan Government, Department of Water and Sewerage Services, has built the Mill Creek Trunk Sewer Project No. 98-

SG-13 anticipating participation from developers at $2,000.00 per connection towards the cost of the Project; and

WHEREAS, this Project is deemed to benefit both parties and the general community, and the Metropolitan Government agrees to pay an amount not to exceed $200,000.00 towards construction of the Project.

The Participation Agreement For Sewer Services incorporated into Ordinance No. BL2007-67 by reference provided, in pertinent part:

The project consists of removal of the existing pump station and replacement with approximately 5,100 linear feet of gravity sewer to the existing gravity sewer line Project No. 07-SL-0113, complete with all necessary easements and appurtenances.

* * *

METRO agrees to participate in the construction costs for a portion of this project in the lessor amount of $200,000 or 50% of the actual construction cost as determined by the contractor's affidavit . . . . Actual payment may be in the form of capacity fee credits or cash. All cash payments will be made upon completion of the work and deeding to METRO.

BK will be responsible for all other costs associated with this project.

BK Partners hired Dale to prepare plans for the sewer improvements, which consisted of installing approximately 5,000 linear feet of sewer pipe on adjacent land and removing an existing pump station ("the Project"). The Project was delayed for a time due to economic factors.

In January of 2012, BK Partners entered into a contract ("the Service Agreement") with Harakas Construction, Inc. ("Harakas") for work on the Project. Metro was not a party to the Service Agreement and had no input into the hiring of Harakas or the terms of the Service Agreement. The Service Agreement called for Harakas to install sewer pipe and remove the pump station. Work on the Project began in March of 2012. During construction, Harakas encountered unforeseen soil conditions, and Harakas and BK Partners agreed to two change orders, which increased the amount of the Service Agreement. Metro was involved in discussions regarding the unforeseen conditions and the change orders.

Harakas performed the extra work and mostly completed the Project on June 21, 2012, with the exception of reconstruction of a fence. On that date, Harakas tied the new sewer system into the existing sewer system, and Metro began using the new sewer system. Around this same time period it was discovered that the new sewer system was not the proper elevation because it was too high to connect sewer outfall from adjacent property owned by Kampgrounds of America ("KOA"). Due to the elevation, the sewer system required a pump station to connect KOA's outfall and could not be a gravity fed system as originally designed. Because of the issue with the KOA line, Metro refused to fund any more of the Project. Metro, however, continued to use the sewer system.

BK Partners defaulted on its obligation to pay Harakas both the original balance pursuant to the Service Agreement and the change order balance. Allegedly, BK Partners owed Harakas over $235,000. BK Partners also defaulted on repayment of its loan to Wilson Bank & Trust, and the Property was sold at foreclosure in 2013. Wilson Bank & Trust purchased the Property at the foreclosure sale. The Property later was dedicated to parks and conveyed to Metro.

Harakas sued Metro, BK Partners, and Wilson Bank & Trust[1]. Harakas later was granted leave to amend its complaint to add claims for negligence and negligent misrepresentation against Dale. In September of 2014, Dale filed a Suggestion of Bankruptcy alleging that BK Partners had filed a petition for bankruptcy. Dale also filed a motion for stay pending the outcome of the bankruptcy. An order was entered staying the instant case pending the outcome of the bankruptcy. In January of 2015, Harakas filed a notice of filing an order from the bankruptcy court granting relief from the automatic stay. In July of 2016, Harakas filed a Notice of Voluntary Nonsuit taking a nonsuit against BK Partners in the instant case.

Metro filed a motion for summary judgment alleging sovereign immunity. Dale filed a motion for summary judgment alleging that it did not breach the standard of care required of civil engineers, that it properly performed all services required by its contract with BK Partners, that Harakas had failed to produce any evidence that it justifiably relied upon false or faulty information provided by Dale or that Dale failed to exercise reasonable care in obtaining information provided in the plans, and that Dale did nothing to prevent BK Partners from making payment in full to Harakas.

Nicholas Curtis Harakas was deposed, and he testified that Harakas entered into the labor-only Service Agreement with BK Partners to "construct underground utility services," or in other words, to lay pipe. He testified that Harakas was to lay pipe only, not remove the pump station. Mr. Harakas testified that the Project called for the

---

[1] An agreed order dismissing Wilson Bank & Trust with prejudice was entered in January of 2014, and Wilson Bank & Trust is not involved in this appeal.

installation of approximately 4,600 linear feet of sewer pipe. He further testified that the Service Agreement provided no provisions for dealing with stone outcroppings or bedrock, and provided that all instances of rock would be handled on a case-by-case time and materials basis. Mr. Harakas admitted that the majority of the Service Agreement was drafted by Harakas.

Mr. Harakas testified that Metro was to provide materials for the Project. Albert McKee of Metro was on-site to oversee work on the Project and report back to Metro. Mr. Harakas explained that the Service Agreement was for labor and materials not provided by Metro such as gravel for pipe bedding. Mr. Harakas stated that he was supposed to be paid for labor and materials not provided by Metro. He understood that Metro would not be providing gravel.

Mr. Harakas testified that he also understood that the cost of the Project was to be split equally between Metro and BK Partners. Mr. Harakas expected to receive a check from BK Partners for its share and a check from Metro made jointly to Harakas and BK Partners for Metro's share. Mr. Harakas testified that BK Partners did not pay Harakas for the work performed under the Service Agreement. He further stated that Harakas never received any checks from Metro.

The high-rise condo project that BK Partners intended to construct on the Property never was completed. Mr. Harakas testified that Metro now owns the site and is using it to "take soils and concrete and asphalt and things to fill the [excavated] site in."

Mr. Harakas admitted that the work Harakas performed under the Service Agreement was not completed. He stated that Harakas did not finish "[s]eeding and strawing and placement of fence." Mr. Harakas testified that this work would cost approximately $20,000. He explained that $10,000 of this uncompleted work would be covered under the Service Agreement, and $10,000 would fall under the change orders.

Mr. Harakas claimed that Metro "committed verbally" to the change orders and that this authorization came from Mike Morris. Mr. Harakas understood that BK Partners did not have any additional financing other than what it had from Wilson Bank & Trust, and that any additional funds would need to come from Metro or another source. Mr. Harakas stated that he wanted a guarantee that Metro was going to cover the additional costs for the change orders.

Mr. Harakas was asked about the discussions regarding the change orders, and he stated:

5

Basically, the change orders that Brian agreed to was under the assumption that Metro would be willing to pay for, if not all of it, a large portion of it, because the bank had only allotted X amount of dollars to do that.

And we had a meeting with Metro officials discussing that, and they agreed to go back to council to seek additional funding, but not until after the project was complete, to make sure that all work was completed and no additional monies were needed to complete the project. So they would only have to go back to council one time to seek additional funding.

When the unforeseen soil conditions were discovered, the Project was stopped "for almost 30 days" and discussions were held about funding. Mr. Harakas was asked who was involved in those discussions, and he stated: "It was Wilson Bank & Trust; Brian Kemp; Metro Water Services, which would be Mike Morris, Cyrus Toosi; Dale & Associates. We all had a meeting discussing that." Mr. Harakas testified that Wilson Bank & Trust indicated that the loan amount was nearly drawn out and Brian Kemp "said that if the bank wasn't willing to fund that additional portion, that Metro would have to fund the additional portion, whatever was left that the bank would not fund." Mr. Harakas stated that the result of the conversations "was that the bank would fund the portion that they had already allotted and that Metro would go back to council and seek additional funding to fund the remaining portion of it." Mr. Harakas testified that to his knowledge Metro has not gone back to council to seek additional funds.

Mr. Harakas stated that BK Partners responded to the change orders by sending him emails approving the additional work. Mr. Harakas agreed that under the Service Agreement, no one from Metro was required to provide any type of authorization in order for Harakas to proceed with the additional work under the change orders.

Harakas had completed the work on both change orders before the problem with the KOA line was discovered. Mr. Harakas stated that after the problem with the KOA service line was discovered:

we actually had a meeting with Brian, Mike Morris, Cyrus, and Roy and Michael. And it was discussed that this was a problem and that it needed to be solved. Other than putting a pump in, it needed to be 100 percent gravity in order for Metro to continue participating.

Michael Morris who works in the Development Services group of Metro Water Services was deposed and testified that his "group reviews and approves construction plans and coordinates development activities on behalf of Metro Water Services." Mr. Morris explained that "[a] gravity sewer is one that transports waste water by gravity by

6

difference in elevation." Mr. Morris explained that Cyrus Toosi is his boss, and that Albert McKee was their construction inspector on the Project. Mr. Morris was asked about decisions on participation agreements, such as what percentage would be assigned to Metro, and he explained that such decisions had to go through his boss, then an asset management committee would need to approve the agreement, then the director would need to sign off, and then the decision would go to Metro council.

Mr. Morris was asked if he remembered the change orders, and he stated:

> I remember requests for a couple, yes. . . . I was asked about them, and I – and I remember reading one of my e-mails in preparation for today where I specifically said, you know, it has to be built to our specs, but we can't approve a change order without going back to council; we cannot do it.

Mr. Morris was asked if he recalled any statement that Metro would go to the council for additional funding, and he stated:

> I remember that we would consider it, but ultimately, you know, there again, it's not - - wasn't our - - wasn't my decision. You know, I would support it. I would, you know - - whatever. If we got what we needed and everything, you know, was built to specs and everything was perfect, if there were, you know, issues that were legitimate, I would ask, but it had to make its way through the food chain for approval.

Mr. Morris admitted that Metro has not gone back to council to seek additional funding. He was asked if Metro had discussed doing so, and he stated: "No point. It's still a pump station involved. The agreement was based on the removal of the pump station and having a gravity system, and we still don't have a gravity system today." Mr. Morris admitted that with the exception of the KOA tie-in, Metro got what it requested.

Mr. Morris was asked if Harakas or BK Partners ever approached Metro about providing additional funding, and he stated: "They did. They approached us about it, and we answered in May of 2012 that, you know, any additional work would have to be approved by Metro council, you know, that we could not unilaterally decide to increase that participation amount."

Mr. Morris testified that Metro never approved or signed off on any change order. He stated:

Curt [Harakas] kept submitting change orders to us wanting us to approve them, and we kept telling him our agreement - - just like my e-mail says - - is with the developer. If he wants to request a change order, he needs to send it to us, you know. And even though he sends it, it still has to go to Metro council for approval. I think we were very clear that we could not agree to any type change order; that our agreement was with BK Partners.

Mr. Morris agreed that he represented that Metro would seek additional funds "[a]t some level . . . [t]o be identified," at the end of the job, which has not happened due to the issue with the pump station. He further stated: "[They] [d]id not give us the product for which we had agreed to pay." Mr. Morris was asked if Metro would seek additional funds from council if the situation with the pump station were addressed, and he stated: "I was willing to take it to bat. I have no idea of the outcome, and that's why, you know, I had to be really careful. I couldn't say, you know, 'By gosh and by darn, we're going to do this,' because I don't have that authority."

Mr. Morris was shown an as-built, and he stated it was for the Holiday Travel Park pump station and showed an inlet from KOA. He testified that his staff typically would not compare a proposed design with an as-built, but would rely upon the engineer submitting the design to "have done his homework."

Cyrus Toosi was deposed and was asked if Metro would review a proposed design and compare it to as-builts, and he stated:

I would say there's a cursory - - cursory review of the project. But we don't - - in the engineering field, we don't necessarily always rely on as-builts, as this was done 40 years ago.

So there had to be a survey that was done by the engineer to make sure, No. 1, field conditions haven't changed in 40 years; and No. 2, that things are still accurate out there. I think we rely more on field survey and engineer stamp of - - of a project as much as we relied on this engineer's stamp of the project.

Mr. Toosi was asked about the process if one wanted to view an as-built, and he stated:

They would come to our records room. We have a records room, and we have a staff of folks.

8

It's a little bit diff - - - different, you know, on exactly what they wanted to see. And we - - you know - - . . . . We could pull and print out copies of whatever they wanted. We don't tell them what they need.

Albert T. McKee testified during his deposition that he is one of the inspectors who works for Metro Water, and that he visited the site of the Project on a daily basis. When asked if he was there until the end of the work, Mr. McKee stated:

Well, with the mishap of being able to hook all the supposed customers onto the gravity line, there was one customer we weren't able to. So they pulled me off. And then I think another section came in, Brent Freeman, I think it is, his people came in and finished it up by setting a grinder pump and so on and making the final connection.

Mr. McKee stated that when they encountered the unsuitable soils the Project shut down for what "seemed like a month. I don't know if it was. Might have been a little longer." He further stated:

Well, I believe the engineering firm, Dale & Associates, had a geotech come out and evaluate what had to be - - take the place of supporting the manholes and the pipe and so on.

So they gave us a few criterias [sic] to meet, like putting shot rock underneath the manholes, and a filter fabric to kind of help control some of that, also. But that was find [sic] and good, but Harakas was going to have to shell out the money for this to come in. And he wanted to have a meeting with Metro prior to going forward.

Mr. McKee recalled being in at least one meeting where the issue regarding the unsuitable soils was discussed. He was asked if a resolution was reached about how to pay for the additional costs, and he stated:

Well, the section - - engineering section heads came up with a deal if - - whatever to take place to resolve the problem and where we can resume work, getting everything installed, that Curt would foot the bill on the extra material.

Once the job was completed, Harakas, Curt, was supposed to come back with a bill of what he had spent for all of the extra material and hauling and everything else and be reimbursed. That way our people could go back to the council and ask one time, instead of going back multiple

times, and ask just one time for extra amount of money to cover the costs. . . . I think Mike came up with that proposal, but Cyrus agreed with it, also, verbally.

When asked if there was a sense of urgency on Metro's part to prevent further delay on the Project, Mr. McKee stated: "Yes, it was. Because the pump station that was going to be removed was in failing [sic]. I think one of the main motors that drive the pump, one had already failed. There's two of them. And one - - and it was limping along, so . . . ."

During his deposition David Brian Kemp of BK Partners agreed that Harakas had installed the specific gravity line as designed by Dale. Mr. Kemp testified that BK Partners borrowed $200,000 from the bank and repaid that entire amount to the bank. He further testified that 100 percent of the $200,000 loan from the bank went to Harakas.

When asked if there were additional discussions before Harakas began the additional work after the unsuitable soils were discovered, Mr. Kemp stated:

Sure. He came to me and asked me if I could pay for the additional work and I said no, that I don't have any additional monies. The bank had only approved what they had approved.

I believe he made attempts at that point to go directly to the bank and try to get the bank to allot more money to give him, which at that time, I believe John Goodman was unwilling to do without more information or - - I don't think he was at that point willing to do that and also said that it was not appropriate for your client to come straight to him.

Then Curt went to Metro and did the same thing and they told him the same thing, that at that point they were not -- that they wanted to take a wait and see, and that they would have to go back to council to ask for more funds if they needed to. Let's get to a point where the money that we have allocated for this job had been exhausted before they would go that direction. . . . I was active in the conversation from the standpoint that both my bank and Mike Morris said Harakas is coming up here and trying to get money out of us. I knew that. They called me and told me that. Because when he came to me and I said I don't have any more money to give you, maybe this is just not going to work.

And then at a certain point, once – because the big issue on my plate which I thought was going to stop the project was the cost of all those

10

materials. Because I knew there was no way the additional money was there for, you know, the materials that were going to have to be used instead of what he had originally agreed upon.

And so it was decided by Mike Morris that Metro would go ahead and pay out of what they had already been approved for the additional materials necessary and if there was a need to go back and ask for more money is the future then he would consider doing that.

And that seemed to -- you know, because we had the materials in place and because it was decided that they could safely move forward using the right techniques, and the willingness of Metro to consider to go back and ask for more if it was required since they stood to gain by all this occurring, then it was decided for everybody to move forward.

Mr. Kemp was asked who at Metro he was talking about, and he stated "Mike Morris and I guess Alan Hand and Cyrus Toosi but I can't remember exactly. I know it was Mike's decisions. Mike was making the decisions."

Mr. Kemp was asked why BK Partners had not paid Harakas, and he stated:

BK Partners paid 108 percent of what they owed under the contract to Harakas Construction. Our obligation was to pay on the $371,000 contract, Metro had agreed to pay up to $200,000 of what it was going to cost to do this job.

BK Partners was to pay the remaining balance. There was [sic] the three people on the job who were there to authorize that the job was going per the contract. And one of those was hired by the bank, Keven Estes, who was the chief engineer at Dale & Associates because he was working on unrelated projects with the bank. They hired him to approve each draw as it went along for the bank.

Mr. Kemp testified that he has not been asked to deed the sewer system to Metro, and the sewer system had not been deeded to Metro.

During his deposition, Kevin Estes was shown an as-built for the KOA line dated November 6, 1972. He was asked how someone would access such an as-built, and he stated: "You would request it at Metro, I would assume." Mr. Estes was asked if that were something he as an engineer working on a project would typically look at when designing a sewer system, and he stated: "Not necessarily. I would think an as-built of an

11

actual station in the field would be more representative. I can sit here and tell you that a benchmark in 1972 may not be representative of a benchmark in 2012." Mr. Estes was asked how one would verify what's in the field, and he stated:

> Well, you would - - you would still find the bottom of a manhole, even with flow, whether it's with a rod or it's - - you request it from Metro. And I know that in this situation we had a survey done, and we designed it all for survey. And they were - - well, we just assumed that they found the bottom.

Mr. Estes testified that Dale relied upon the survey when designing for the Project.

Mark P. Lee, P.E. was deposed and when asked what is involved in the planning and design of a gravity-fed sewer system, he stated:

> When you start with a property that you want to provide sewer service to, you get the information for the downstream system that you will be basing your design on, and then, based on that information, you design your system. If there are points of connection, typically you'd pick those up on a survey and design to those points. . . . In Metro, you contact Metro Water Services and tell them the area that you're designing in and ask for a sewer atlas of the area, and you look on the sewer atlas and you see any project, previous project numbers that have been designed that you would need to - - that you would encounter with your design, and ask them for any information they have on that.

He stated that these are the only two ways, either obtain information provided by Metro or conduct a topographic survey. Mr. Lee never has done a field survey, but he has surveyors that he sends into the field to collection information.

Mr. Lee explained that when contacted, Metro provides a sewer atlas, which:

> shows lines over a gridded - - it's a gridded area of Nashville. And so you tell them what area you're working in and they look up that particular grid map, and it's called a sewer atlas.

> And you look on that sewer atlas and note any points that you would start with or encounter, and you ask for those project numbers that have previously been designed; you ask for the information on that. . . . They'll provide the designs for those project numbers, but not - - you have no way

of knowing if it's - - how much information they have on it because you're not privy to it.

Mr. Lee was asked how the as-builts are provided, and he explained: "Typically, we let them know what sewer projects we need and they make copies and we pick them up."

Mr. Lee testified that he does not know if Dale requested information from Metro. He also does not know what information Dale received, but he stated that it was his understanding that Dale had asserted that they "didn't recall having seen this [as-built of the Holiday Travel park] until afterwards." Mr. Lee agreed that if Dale had failed to request information from Metro that would be a violation of the standard of care, but he admitted that he has no idea whether Dale requested the information or not. Mr. Lee also admitted that for his own projects he has no way of knowing whether Metro had omitted as-built information that he had requested.

Jared R. Gray, PE, an expert witness for Harakas, prepared an expert witness report and opined that Dale deviated from the standard of care in its design of the sanitary sewer plans. Mr. Gray was deposed, and when asked about obtaining information to prepare plans, he testified that one would need to go through Metro's project manager to obtain information on the atlas.

Mr. Gray stated: "My opinion would be that you would utilize the smallest pipe diameter necessary in order to carry the design flow. And that in this particular case, I would design a pump station to handle the affluent." He further stated:

> Assuming they're placed in the appropriate locations, as dictated, I would say that the design, as drawn, is insufficient due to the fact he didn't include his pump. He didn't include - - in fact, he told - - he said to remove it.
>
> That's where I think the error occurred. Because it doesn't function without a pump. But if the pump was there, and the pump was designed, and it was submitted as part of these drawings and approved, again, I would say that the system would function. . . . And would meet the standard of care if there was a pump, yes.

Mr. Gray agreed that his only criticism of Dale's design is that there is not a lift station pump shown for the KOA line. Mr. Gray was unaware of any remediation that has been done. When asked to assume that when the situation with the KOA line was discovered Dale recommended placement of a pump and asked whether that would have been the correct thing to do, Mr. Gray stated: "Absolutely. I would agree with that, yes."

13

Roy Dale was deposed and was asked about the procedure for obtaining as-builts and project-related information from Metro when designing a sewer, and he stated:

> Just go to the Water and Sewer Department - - first thing we do is we look at Metro's water and sewer atlas, and in this case there was no connections shown. I know that for a fact. That's the first thing we do, just see where public lines are. If there's an as-built of a gravity sewer system, we'll get that as well.

When questioned further about the process, Mr. Dale stated that he does things differently from others. He explained that he would call and ask Metro to provide any information they might have.

> Mr. Dale testified about the Project stating:

> we were designing a gravity flow system from one manhole to another manhole. We were not involved in any way in the elimination of the pump station. That was somebody else. So we were simply designing sewer from Point A to Point B.

When asked if the design would have been different if the KOA line had been discovered up front, Mr. Dale stated:

> This is a really flat - - you have a given elevation that you have to start from and, more or less, a given elevation where you have to end. When you start designing sewer at a really shallow slope, the pipe size gets incrementally larger.

> If I had known that KOA had a pump - - or if I had known that KOA had a flow coming in at an elevation that was going to cause me to have a very large pipe at a slope that was so low that the pipe may not even be able to keep itself clean, then I would have looked at the flow of the KOA site and, most likely - - I'm saying pretty sure - - would have designed a grinder pump to lift that small amount of flow into a proper design, which would have been a higher elevation with a greater slope and a smaller pipe. The presence of unsuitable soils would even increase that, to not try to go deeper with a larger pipe, more load and a lesser slope.

Mr. Dale stated that in his mind the sewer system was designed as economically and efficiently as possible. He stated:

14

I mean, reasonable minds would have recognized very quickly that if you had designed the sewer deeper with a larger pipe, lesser slope, more unsuitable soils, it would have cost hundreds of thousands more. And it seemed all the squabbling was over a grinder pump which wound up being less than $5,000.

Mr. Dale testified that he tried to negotiate some ways to deal with the problem with the KOA line after it was discovered.

Michael Garrigan, P.E., a principal of Dale and a registered professional engineer in Tennessee, served as the civil engineer of record for the Project and designed the sewer plans. In his affidavit, Mr. Garrigan stated:

5.      The standard of care applicable to projects such as the instant Project requires a civil engineer to review a sewer atlas furnished by Metro Water Services ("Metro") to learn of existing public lines and previous project numbers that have been designed and to review any information provided by Metro related to those projects. Based on the information received from Metro, the civil engineer begins its design based on the downstream point of connection to the upstream point of connection, picking up any known points of collection between the upstream and downstream termini of the particular project. In designing the sanitary sewer line, the applicable standard of care requires the civil engineer to utilize the smallest pipe size that will carry the required flow, set at or above the minimum allowable slope required to connect the sewer line from its upstream point of origination to its downstream terminus, including manholes spaced as necessary. If, during a project, a previously unknown service line is encountered that cannot be connected to a main trunk line by gravity, the applicable standard of care requires the civil engineer to incorporate a grinder pump with the ability to lift the incoming flow into the main trunk line.

6.      Prior to designing the Project, Dale reviewed a sewer atlas provided by Metro for the area in which the Project was located. The atlas furnished by Metro did not show any service line coming from the KOA Kampground. Because Metro did not provide Dale an as-built of the Holiday Travel Park pump station, an existing service line entering the Holiday Travel Park pump station from the adjacent KOA Kampground was not identified until construction was almost complete.

7.      In preparing the design for the Project, Dale utilized a 12-inch sewer pipe set at or above the minimum slope to allow all sewage passing through

15

the pipe to flow by gravity from the upstream point of connection to the downstream terminus of the Project. A 12-inch sewer pipe is the smallest pipe size that would carry the required flow in the Project. When Harakas Construction, Inc. connected the Project to the Metro sewer system, Harakas discovered a previously unknown service line originating from the adjacent KOA Kampground. The KOA pipe could not be seen in the field because the system was in use and the pipe was continuously submerged in several feet of sewage. Further, its existence was not known because Metro did not provide a copy of the Holiday Travel Park pump station nor did the KOA service line appear on the sewer atlas furnished by Metro. To address the low level of flow passing through the KOA service line, Dale designed and recommended a small grinder pump to lift the flow from the KOA service line into the Project.

8.     If Metro had provided Dale the as-built for the Holiday Travel Park pump station, which indicated the presence of the KOA service line, <u>our design would not have been any different from the final design implemented after the KOA line was discovered in the field</u>. We would have still incorporated a small grinder pump to lift the flow passing through the KOA service into the Project.

(emphasis in original). Mr. Garrigan opined in his affidavit that the services provided by Dale met the standard of care required of professional engineers. His affidavit further stated:

10.     I have reviewed the transcript of the deposition of Jared Gray, P.E. conducted on June 2, 2015. In his deposition, Mr. Gray admits he did not know Dale designed and recommended a small grinder pump to lift the flow originating from the KOA Kampground into the new sewer main. *See*, Deposition Transcript of Jared Gray, p. 76, lns 2-5.

11.     Additionally, Mr. Gray acknowledged he was not aware whether Metro provided a copy of the Pump Station as-built to Dale. Deposition Transcript of Jared Gray, p. 50, lns. 21-24. Mr. Gray admitted he did not conduct any research to discover whether or not the Pump Station as-built was on file at Metro. Deposition Transcript of Jared Gray, p. 48, lns. 10-13.

12.     Beginning on page 74, line 21, Mr. Gray opines that in designing the Project, the applicable standard of care requires an engineer to "use the smallest pipe size that would carry the required flow with manholes spaced as necessary and a grinder pump station designed at the pump station to carry the KOA flow." Deposition Transcript of Jared Gray, p. 74, ln. 21

16

through p. 75, ln. 4. Mr. Gray and I are in complete agreement, and that is what we did.

13. The only portion of Dale's design with which Mr. Gray took issue was that the small grinder pump was not included in the original plans. Deposition Transcript of Jared Gray, p. 75, lns. 5-8. Mr. Gray admitted, however, that "if the pump was there, and the pump was designed, and it was submitted as part of these drawings and approved, again, I would say the system would function . . . [a]nd would meet the standard of care." Deposition Transcript of Jared Gray, p. 75, lns. 11-18.

14. As indicated in Paragraph 7 of this Affidavit, after Harakas discovered the previously unknown KOA service line, we designed and recommended the installation of a small grinder pump to handle the KOA flow. Upon learning that Metro had not provided a copy of the Pump Station as-builts to Dale, Mr. Gray acknowledged the recommendation and placement of a small grinder pump during construction was the correct thing to do. Deposition of Jared Gray, p. 76, lns. 6-11.

15. Mr. Gray and I are in agreement that Dale's overall sewer system design was correct, and that our services met the required standard of professional care.

(emphasis in original).

After a hearing on the motion for summary judgment filed by Metro, the Trial Court entered its order on April 29, 2016 granting Metro summary judgment after finding and holding, *inter alia*, that Metro was immune from suit due to sovereign immunity. Specifically, in the April 29, 2016 order the Trial Court found and held:

In the case at bar, there is no statute or ordinance that allows Harakas's equitable claims against Metro. Metro's contract, the Participation Agreement, was with the developer, BK Partners – not Harakas. It was confirmed by ordinance. The case law does not support these equitable claims under the circumstances of this case. There was no bond, and there was no privity of contract between Metro and Harakas.

Harakas relies upon conversations between Mr. Harakas and Metro employees. However, the Court does not find anything in these conversations that would be sufficient to bind the Metropolitan Government or obligate it to pay any amount to Harakas. Any alterations to the contract between Metro and BK Partners were required to be approved by the Metro Council.

17

After a hearing on the motion for summary judgment filed by Dale, the Trial Court entered its order on June 23, 2016 granting summary judgment to Dale after finding and holding, *inter alia*, "Dale established by sworn testimony in the record that its services met the required standard of care for professional engineers, and this fact has not been controverted by [Harakas]," all of the claims raised by Harakas "require proof that the [engineer for Dale] failed to perform in accordance with the required standard of professional care," thus, Dale has negated an essential element of Harakas's claim. The Trial Court further found that the negligence alleged by Harakas did not result in damages to Harakas because there was no actual or proximate causal relationship between the alleged conduct by Dale and the damages sought since the alleged design error did not cause BK Partners to fail to pay its contract balance to Harakas. Rather, the debts of BK Partners were discharged in bankruptcy.

Harakas appeals the grants of summary judgment to this Court.

## **Discussion**

Although not stated exactly as such, Harakas raises two overall issues on appeal: 1) whether the Trial Court erred in granting summary judgment to Metro due to sovereign immunity; and, 2) whether the Trial Court erred in granting summary judgment to Dale.

As our Supreme Court has instructed:

> Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. We review a trial court's ruling on a motion for summary judgment de novo, without a presumption of correctness. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997); *see also Abshure v. Methodist Healthcare–Memphis Hosp.*, 325 S.W.3d 98, 103 (Tenn. 2010). In doing so, we make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied. *Estate of Brown*, 402 S.W.3d 193, 198 (Tenn. 2013) (citing *Hughes v. New Life Dev. Corp.*, 387 S.W.3d 453, 471 (Tenn. 2012)).

> \* \* \*

> [I]n Tennessee, as in the federal system, when the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the

18

nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense. We reiterate that a moving party seeking summary judgment by attacking the nonmoving party's evidence must do more than make a conclusory assertion that summary judgment is appropriate on this basis. Rather, Tennessee Rule 56.03 requires the moving party to support its motion with "a separate concise statement of material facts as to which the moving party contends there is no genuine issue for trial." Tenn. R. Civ. P. 56.03. "Each fact is to be set forth in a separate, numbered paragraph and supported by a specific citation to the record." *Id*. When such a motion is made, any party opposing summary judgment must file a response to each fact set forth by the movant in the manner provided in Tennessee Rule 56.03. "[W]hen a motion for summary judgment is made [and] . . . supported as provided in [Tennessee Rule 56]," to survive summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading," but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, "set forth specific facts" *at the summary judgment stage* "showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, 106 S. Ct. 1348. The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party. If a summary judgment motion is filed before adequate time for discovery has been provided, the nonmoving party may seek a continuance to engage in additional discovery as provided in Tennessee Rule 56.07. However, after adequate time for discovery has been provided, summary judgment should be granted if the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the existence of a genuine issue of material fact for trial. Tenn. R. Civ. P. 56.04, 56.06. The focus is on the evidence the nonmoving party comes forward with at the summary judgment stage, not on hypothetical evidence that theoretically could be adduced, despite the passage of discovery deadlines, at a future trial.

*Rye v. Women's Care Cntr. of Memphis, MPLLC*, 477 S.W.3d 235, 250, 264-65 (Tenn. 2015).

We first consider whether the Trial Court erred in granting summary judgment to Metro due to sovereign immunity. With regard to sovereign immunity, this Court has explained:

19

The doctrine of sovereign immunity has been part of the common law of Tennessee for well over a century and provides that suit may not be brought against a governmental entity unless that governmental entity has consented to be sued. *Hawks v. City of Westmoreland*, 960 S.W.2d 10, 14 (Tenn. 1997) (citing *Lucius v. City of Memphis*, 925 S.W.2d 522, 525 (Tenn. 1996)). The doctrine originated in feudal notions of the divine right of kings, as the king " 'was at the very pinnacle of the power structure and was answerable to no court[.]' " *Id*. (quoting *Cooper v. Rutherford County*, 531 S.W.2d 783, 786 (Tenn. 1975) (Henry, J., dissenting)). The longstanding rule of sovereign immunity is embodied in the Tennessee Constitution, which provides, "Suits may be brought against the State in such manner and in such courts as the Legislature may by law direct." Tenn. Const., Art. I, § 17. In addition, Tennessee Code Annotated section 20–13–102(a) provides, "No court in the state shall have any power, jurisdiction or authority to entertain any suit against the state . . . with a view to reach the state, its treasury, funds or property, and all such suits shall be dismissed[.]" In the context of sovereign immunity, " '[t]he State' includes 'the departments, commissions, boards, institutions *and municipalities* of the State.' " *Davidson v. Lewis Bros. Bakery*, 227 S.W.3d 17, 19 (Tenn. 2007) (quoting *Metro. Gov't of Nashville & Davidson County v. Allen*, 220 Tenn. 222, 415 S.W.2d 632, 635 (Tenn. 1967)) (emphasis added).

"Under both the common law doctrine and the constitutional provision, 'governmental entities may prescribe the terms and conditions under which they consent to be sued, . . . including when, in what forum, and in what manner suit may be brought.' " *Sneed v. City of Red Bank, Tenn*., 459 S.W.3d 17, 23 (Tenn. 2014) (quoting *Cruse v. City of Columbia*, 922 S.W.2d 492, 495 (Tenn. 1996)). Our state constitution specifically empowers the legislature—not the judiciary—to waive the protections of sovereign immunity. *Hughes v. Metro. Gov't of Nashville & Davidson Cnty*., 340 S.W.3d 352, 360 (Tenn. 2011); *Mullins v. State*, 320 S.W.3d 273, 283 (Tenn. 2010). "The General Assembly undoubtedly has control over the 'manner . . . and courts' in which suits against governmental entities may be pursued." *Estate of Bell v. Shelby Cnty. Health Care Corp*., 318 S.W.3d 823, 837 (Tenn. 2010).

The "traditional construction" of Tennessee's constitutional provision regarding sovereign immunity "is that suits cannot be brought against the State unless *explicitly authorized* by statute." *Colonial Pipeline*

*Co. v. Morgan*, 263 S.W.3d 827, 849 (Tenn. 2008) (emphasis added). In other words, " 'legislation authorizing suits against the state must provide for the state's consent in 'plain, clear, and unmistakable' terms." *Mullins*, 320 S.W.3d at 283 (quoting *Northland Ins. Co. v. State*, 33 S.W.3d 727, 731 (Tenn. 2000)). Courts will not find a waiver of sovereign immunity " 'unless there is a statute clearly and unmistakably disclosing an intent upon the part of the Legislature to permit such litigation.' " *Davidson*, 227 S.W.3d at 19 (quoting *Scates v. Bd. of Comm'rs of Union City*, 196 Tenn. 274, 265 S.W.2d 563, 565 (1954)).

"In determining whether the General Assembly intended to waive sovereign immunity for a claim against the State of Tennessee . . ., our primary focus must remain on the actual words chosen and enacted by the legislature." *Mullins*, 320 S.W.3d at 283.

*Bratcher v. Hubler*, 508 S.W.3d 206, 208-10 (Tenn. Ct. App. 2015).

In its brief on appeal, Harakas argues that Metro waived sovereign immunity by virtue of its Charter and its Emergency Procurement Ordinance and states:

In this case, Metro acted pursuant to the authority vested in it by the Metro Charter, which states as follows (with emphasis added):

1.01 ... The metropolitan government shall be a public corporation, with perpetual succession, *capable of suing and being sued*, and capable of purchasing, receiving and holding property, real and personal, and of selling, leasing or disposing of the same to the same extent as other governmental entities.

2.01(9) *To provide for the creation, maintenance, building or purchase and operation of waterworks, electric power system, gas plants, transportation facilities, public airports, and any other public utility, including sewers and a sewage disposal system*; to fix such rates and provide for the making of such charges and assessments as are deemed necessary for the proper furnishing of such services; and to provide liens or penalties and withdrawal of service for refusal or failure to pay same.

2.01 (37) *To enter into contracts and agreements* with other governmental entities and also *with private persons, firms and*

*corporations with respect to furnishing by or to the other services and the payments to be made therefor.*

2.02 In addition to other powers herein granted, *the metropolitan government shall be vested with (1) any and all powers which cities are, or may hereafter be, authorized or required to exercise under the Constitution* and general laws of the State of Tennessee, as fully and completely as though the powers were specifically enumerated herein, except only for such limitations and restrictions as are provided in Tennessee Code Annotated, section 7-1-101 et seq., as amended, or in this Charter; and (2) any and all powers which counties are, or may hereafter be, authorized or required to exercise under the Constitution and general laws of the State of Tennessee, as fully and completely as though the powers were specifically enumerated herein, except only for such limitations and restrictions as are provided in Tennessee Code Annotated, section 7-1-101 et seq., as amended, or in this Charter; and (3) any and all powers possessed by the County of Davidson or the City of Nashville immediately prior to the effective date of this Charter.

In addition to the above, Metro Ordinance 92-210 § 1 (3-206), 1992, provides as follows:

### 4.12.070 - Emergency procurements.

Notwithstanding any other provision of this code, the purchasing agent may make or authorize others to make, emergency procurements when there exists a threat to public health, welfare or safety under emergency conditions as defined in regulations promulgated by the standards board; provided that such emergency procurements shall be made with such competition as is practical under the circumstances. A written determination of the basis for the emergency and for the selection of the particular contractor shall be included in the contract file. Any department head or other official who makes an emergency purchase without following the regulations of the standards board may be held personally liable for such purchase.

Harakas then argues that:

[T]he Metro Charter authorizes Metro to sue and be sued; to provide for the creation, maintenance, building or purchase and operation of sewers and a sewage disposal system; and to enter into contracts and agreements with private persons, firms and corporations with respect to furnishing by or to the other services and the payments to be made therefor.  In addition, Metro Ordinances provide for a department head or other official to make emergency procurements when there exists a threat to public health, welfare or safety under emergency conditions.  In other words, Metro waived sovereign immunity in its Charter and Emergency Procurement ordinance as to claims such as the claims of unjust enrichment and promissory estoppel asserted against Metro by Harakas.

We agree that the Metro Charter authorizes Metro to sue or be sued, to provide for sewers and a sewage disposal system, and to enter into contracts.  We also agree that the Emergency Procurement Ordinance provides for "emergency procurements when there exists a threat to public health, welfare or safety under emergency conditions as defined in regulations promulgated by the standards board . . . ."  The conclusion reached by Harakas, however, does not follow from these premises.  Nothing within these sections of the Metro Charter or the Emergency Procurement Ordinance shows an intent to consent to be sued for unjust enrichment and promissory estoppel.  We will not find a waiver of sovereign immunity in the absence of an enactment "clearly and unmistakably disclosing an intent upon the part of the Legislature to permit such litigation."  *Bratcher*, 508 S.W.3d at 210 (quoting *Scates v. Bd. of Comm'rs of Union City*, 265 S.W.2d at 565).

Focusing on the actual words chosen and enacted, as we must, we find nothing within the Metro Charter or the Emergency Procurement Ordinance that clearly and unmistakably discloses an intent to allow for a suit such as the one now before us on appeal.  Harakas has pointed to nothing that shows that Metro has waived its sovereign immunity.

In the alternative, in its brief on appeal, Harakas argues that Metro should be estopped from denying its agreement to pursue additional funding from its council in exchange for Harakas performing the soil remediation work and finishing the installation of the sewer line and further argues that Metro acted within its powers in making this agreement.

Our Supreme Court has explained:

Ultimately, the application of estoppel or implied contract must be determined on the facts and equities of the particular case.  The principles of estoppel are well settled and not every case will require application of

estoppel or of implied contract. The classic case of estoppel in the present context is the acceptance of the benefits of a contract and the subsequent refusal of a city to pay for the benefits received. *See, e.g., Trull v. City of Lobelville*, 554 S.W.2d 638, 641–642 (Tenn. App. 1976). For estoppel to arise, the act must have been done with the knowledge that it would be relied upon and the other party has acted in reliance without either knowledge of the true state of affairs or the means of learning the true state of affairs. *E.g., Early Co. v. Williams*, 135 Tenn. 249, 261, 186 S.W. 102, 105 (1916). "When both parties have the same means of ascertaining the truth, there can be no estoppel." *Id*. (citations omitted). *See also Rambeau v. Farris*, 186 Tenn. 503, 508, 212 S.W.2d 359, 361 (1948). Moreover, when entering a contract with a municipality, "[o]ne dealing with municipal officers, boards, or committees is bound at his peril to take notice of the limitation of their authority." *Kries & Co. v. City of Knoxville*, 145 Tenn. 297, 305, 237 S.W. 55, 57 (1921). The contents of a city charter are public and readily available to all who deal with a city. *Nashville v. Sutherland & Co.*, 92 Tenn. 335, 339–340, 21 S.W. 674, 675 (1893).

> " 'In determining the extent of the power of a municipal corporation to make contracts, and in ascertaining the mode in which the power is to be exercised, the importance of careful study of the charter or incorporating Act . . . can not be too strongly urged. Where there are express provisions on the subject, these will, of course, measure, as far as they extend, the authority of the corporation.' "

*Id*., 92 Tenn. at 338, 21 S.W. at 675 (citation omitted).

Because the power of a city to contract is based upon the expenditure of city funds, it

> "is equivalent in its character to the power to levy, collect, and disburse taxes, inasmuch as, if the contract be valid, it must be complied with, and the price agreed to be paid must be raised by taxation, and paid out under the appropriations of the proper city government. The power to make such a contract, being equivalent in general to the power to levy and disburse taxes, must be exercised in the same manner and by the same authority, that is, by a corporate act."

24

*Mayor and City Council of Nashville v. Hagan, supra*, 68 Tenn. at 500–501, 274 S.W.2d 635. Consequently, the law protects the citizens of the municipality from the waste of city funds and the resulting unnecessary burden of taxation. " 'Municipal corporations represent the public, and are themselves to be protected against the unauthorized acts of their officers when it can be done without injury to third parties. Persons dealing with such officers are chargeable with notice of the powers which the corporation possesses, and are held responsible accordingly.' " *Nashville v. Sutherland & Co., supra*, 92 Tenn. at 344, 21 S.W. at 676 (citation omitted). *Cf.* T.C.A. § 6–2–103. Nevertheless, a municipality will not be permitted to rely intentionally upon unauthorized acts or to take advantage of such acts to avoid its obligations or to work a fraud, actual or constructive, upon an innocent party who has been induced by the corporation to rely upon an act and who has reasonably relied upon that act. *E.g., Adams v. Memphis & Little Rock R.R. Co., supra*, at 662–663. Thus, the concepts of estoppel or of implied contract have been used to remedy the unjust enrichment of a city.

*City of Lebanon v. Baird*, 756 S.W.2d 236, 244-45 (Tenn. 1988) (footnote omitted).

In discussing alleged estoppel against a municipality involving possible vested rights in a zoning ordinance, this Court has further noted:

In *Corlew's Auto Salvage, Inc. v. Murfreesboro Bd. of Zoning Appeals*, 1989 WL 54913, at *7 (Tenn. Ct. App. M.S., file May 24, 1989), this Court, in rejecting a similar estoppel argument under the vested rights rubric, stated that "[e]ven though the [*SCA Chemical* ] opinion may contain some comfort to one who expends money or contracts liability under an existing ordinance, *it does not recognize estoppel in favor of one who expends money or creates liability in reliance upon oral statements of administrative officials*." *Id*. (emphasis added). It is clear that estoppel does not generally apply to the acts or statements of public agents. *State ex rel. Moulton v. Williams*, 343 S.W.2d 857, 861 (Tenn. 1961); *Haymon v. City of Chattanooga*, 513 S.W .2d 185, 189 (Tenn. Ct. App. 1973). Though exceptions to this general rule exist, see *City of Lebanon v. Baird*, 756 S.W.2d 236, 242, 244 (Tenn. 1988), we know of no authority supporting an exception under the current facts.

*Westchester Co., LLC v. Metro. Gov't of Nashville and Davidson Cnty., Tennessee*, No. M 2004-02391-COA-R3-CV, 2005 WL 3487804, at *4 (Tenn. Ct. App. Dec. 20, 2005), *no appl. perm. appeal filed*.

In the instant case, no contract exists between Metro and Harakas. Furthermore, the evidence in the record on appeal shows that Metro made no attempt to enter into a contract with Harakas. Rather, Harakas attempts to rely upon statements made by Metro employees. As discussed above, however, "estoppel does not generally apply to the acts or statements of public agents." *Westchester Co.,* 2005 WL 3487804, at *4.

Furthermore, a careful and thorough review of the record reveals that the statements upon which Harakas attempts to rely were statements that Metro would go back to its council to seek additional financing after the Project was completed. Importantly, the statements did not guarantee that additional financing would be available or that, if available, it would be paid to Harakas. At most, the statements indicated a willingness to seek additional financing, not a promise of additional financing. Furthermore, Mr. Harakas admitted during his deposition that Harakas did not complete the Project. As such, even if the statements made by Metro employees indicating a willingness to go back to council to seek additional financing could be considered an offer, the willingness was expressly conditioned upon completion of the work, a condition which has not yet occurred. Thus, given the content of the statements upon which Harakas attempts to rely, we find that estoppel does not apply in this case.

Harakas also argues in its brief on appeal that the Metro Ordinances allow for emergency procurements, and that there was a "sense of urgency to repair the [sewer] line due to a continued public health risk." Harakas asserts: "When the unsuitable soils were discovered during the installation of the new sewer line, which stopped the project, there was a sense of urgency to keep the project moving so that Metro could place it into service, comply with the Consent Decree, and eliminate the recurring overflow issues." Harakas, however, provided nothing whatsoever showing that the Metro purchasing agent made or authorized an emergency procurement. The fact that Harakas or Metro experienced a "sense of urgency to keep the project moving," does not translate into an emergency procurement pursuant to the Metro ordinances.

We find and hold that sovereign immunity applies in this case and that estoppel does not. As such, we find no error in the Trial Court's grant of summary judgment to Metro.

We next consider whether the Trial Court erred in granting summary judgment to Dale. Harakas sued Dale for negligence and negligent misrepresentation and requested damages in an amount "in excess of $235,865.82," which is the amount that Harakas alleged that BK Partners owed to Harakas. Our Supreme Court has explained:

26

In *Giggers v. Memphis Housing Authority*, this Court confirmed the elements essential to a recovery based on general negligence:

> In order to establish a prima facie claim of negligence, basically defined as the failure to exercise reasonable care, a plaintiff must establish the following essential elements: "(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal, cause."

277 S.W.3d 359, 364 (Tenn. 2009) (quoting *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995)).

Negligent misrepresentation, on the other hand, applies to a narrower class of claims. "[T]o succeed on a claim for negligent misrepresentation, a plaintiff must establish 'that the defendant supplied information to the plaintiff; the information was false; the defendant did not exercise reasonable care in obtaining or communicating the information and the plaintiffs justifiably relied on the information.' " *Walker v. Sunrise Pontiac–GMC Truck, Inc.*, 249 S.W.3d 301, 311 (Tenn. 2008) (quoting *Williams v. Berube & Assocs.*, 26 S.W.3d 640, 645 (Tenn. Ct. App. 2000)). "Tennessee has adopted Section 552 of the *Restatement (Second) of Torts* 'as the guiding principle in negligent misrepresentation actions against . . . professionals and business persons.' " *Robinson v. Omer*, 952 S.W.2d 423, 427 (Tenn. 1997) (quoting *Bethlehem Steel Corp. v. Ernst & Whinney*, 822 S.W.2d 592, 595 (Tenn. 1991)). The Restatement (Second) provides as follows:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552(1) (1977).

*Morrison v. Allen*, 338 S.W.3d 417, 437 (Tenn. 2011).

In its order granting summary judgment to Dale, the Trial Court specifically found and held, *inter alia*:

> In this case, the Court finds that there is no genuine issue for trial regarding whether the Defendant engineer Dale performed its services in accordance with the required standard of professional care. Dale established by sworn testimony in the record that its services met the required standard of care for professional engineers, and this fact has not been controverted by the Plaintiff. All causes of action Plaintiff has pursued require proof that the Defendant engineer failed to perform in accordance with the required standard of professional care. Because an essential element of the Plaintiff's causes of action has been negated, the Defendant is entitled to the relief it seeks.
>
> The Court further finds that the negligent activity alleged by the Plaintiff did not result in damages to the Plaintiff. The Plaintiff seeks to recover a contract balance owed it by Defendant BK Partners, LLC, the owner of the project. The plaintiff alleges that Defendant Dale failed to locate a subsurface sewer tap line from the KOA Campground to the old pump station and also failed to design a pump to connect the KOA Campground to the new sewer main constructed by the Plaintiff. There is no actual or proximate causal relationship between the negligent conduct alleged against Dale and the damages sought. The alleged design error did not cause BK Partners, LLC to fail to pay its contract balance. BK Partners, LLC's debts were discharged in bankruptcy. Likewise, the alleged design error did not cause Metro Government to fail to pay the contract balance. This Court previously has ruled that there was no contract between Metro and the Plaintiff requiring such payment and that Plaintiff's claims against Metro otherwise are barred by the doctrine of sovereign immunity.
>
> Finally, the Court finds that there is no legal or equitable basis upon which Dale should be required to insure the successful completion of the project or payments to the contractor. BK Partners' failure to pay the Plaintiff's contract balance was not the foreseeable or proximate result of the design error alleged against Dale.

The evidence in the record on appeal at the summary judgment stage, as discussed more fully above, supports the decision made by the Trial Court. Dale made a properly supported motion for summary judgment negating essential elements of Harakas's claim, *i.e.*, breach and proximate cause, and Harakas failed to show any genuine disputed issues

28

of material fact. We, therefore, find no error in the Trial Court's grant of summary judgment to Dale.

## Conclusion

The judgment of the Trial Court granting summary judgment to Metro and to Dale is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the appellant, Harakas Construction, Inc., and its surety.

_____
D. MICHAEL SWINEY, CHIEF JUDGE